(November 1, 1905.)

## GOODING v. PROFFITT.

[83 Pac. 230.]

CONSTITUTIONAL LAW—MAXIMUM TAX LEVY—FOR STATE PURPOSES— WHAT COMPUTED—STATE DEBTS—COUNTY INDEBTEDNESS.

1. The tax levy authorized by section 9 of article 7 of the constitution "for state purposes" is intended to cover the current and running expenses of maintaining and conducting the state government—legislative, executive and judicial—and the operating and maintaining the state institutions.

2. Public or bonded indebtedness incurred under the provisions of section 1 of article 8 of the constitution for internal improvements and the erection of public buildings and institutions is not anticipated or comprehended within the provisions of section 9 of article 7, and a tax levy for the purpose of paying the interest on such indebtedness and bonds and providing a sinking fund therefor, does not fall within the limits of the maximum rate of taxation as specified and provided by section 9 of article 7.

3. It is within the power of the legislature to pass an act as done by act of March 6, 1905 (Sess. Laws 1905, p. 278), authorizing the board of commissioners of any county indebted to the state on account of state taxes due from such county to the state to make a sufficient levy not exceeding a maximum rate therein specified, for the purpose of paying and liquidating such indebtedness.

(Syllabus by the court.)

APPLICATION by the state board of equalization for a peremptory writ of mandate against the board of commissioners of Nez Perce county, compelling and requiring said board of commissioners to make a sufficient tax levy to raise the county's proportion of state revenue and for special levies on account of certain bonds issued. Writ granted.

J. J. Guheer, Attorney General, and Edwin Snow and F. S. Wettach, for Petitioners.

Attorneys for petitioners contend that the five mill limit applies only to the general current expenses of the state, as provided by the legislature for the fiscal year, and as provided for in House Bill No. 239 (Sess. Laws 1905, p. 293), in which an *ad valorem* tax of $350,000 for each of the fiscal years 1905 and 1906 is levied for the general current expenses of the state. The basis upon which Nez Perce county's apportionment of its proportion of this $350,000 was computed by the state board of equalization is correct. There was segregated from Shoshone county and annexed to Nez Perce county, during the year 1904, territory the assessed valuation of which, as shown by the certified abstract of the assessment-rolls of Shoshone county for the year 1904, for that portion of the county segregated, was $1,197,637.45. This will not be controverted. It was only right that the amount should be added to the valuation of Nez Perce county for the year 1904 in computing its proportion of the tax to be paid to the state for 1905, because she had that property within her borders from which to collect the additional tax which was placed upon her by adding this $1,197,637.45. Section 7, article 7, of the constitution is as follows: "All taxes levied for state purposes shall be paid into the state treasury, and no county, city or town, or other municipal corporation, the inhabitants thereof, nor the property therein, shall be released or discharged from their or its proportionate share of taxes to be levied for state purposes." This does not say "all taxes levied and collected," but the language is confined to the word "levy," and when the levy is made upon the certified list of assessable property for state purposes the county's

liability is absolute after the time in which such taxes become due. It further says, ''All taxes levied for state purposes shall be paid into the state treasury.'' This is mandatory. (*Cunningham v. Moody,* 3 Idaho, 123, 27 Pac. 732.) Under this provision and other provisions of our statutes, and particularly section 1410 of the Laws of 1895, page 101, the state tax is an absolute charge against the county, and for which the county is liable to the state. In 1895 a radical change was made in the manner of levying state taxes. Section 1410 of the Revised Statutes was amended by the act of March 9, 1895 (Laws 1895, p. 101). The levy of a lump sum is valid. (See *State v. Bailey,* 56 Kan. 81, 42 Pac. 373; *State v. Baker County,* 24 Or. 141, 33 Pac. 530.) The duty of the commissioners is stated as follows: ''To ascertain the rate of state taxes necessary to be levied in order to secure the amount apportioned to such county,'' and to levy the same. Under this authority it is their duty to so fix the rate as to produce the full amount due the state, and in doing this they should consider possible delinquencies and cancellations. (*Edwards v. People,* 88 Ill. 340; *Union Trust Co. v. Weber,* 96 Ill. 346; *Sioux City etc. Ry. Co. v. Osceola Co.,* 52 Iowa, 26, 2 N. W. 593; *Chicago etc. R. R. Co. v. Baldridge,* 177 Ill. 229, 52 N. E. 263.) A somewhat similar question has been considered in California. (*Houghton v. Austin,* 47 Cal.. 646; *San Francisco etc. Ry. Co. v. State Board,* 60 Cal. 12 (34).) The courts are clear and decisive on the proposition that the county is to be charged absolutely with state taxes. In *Mayor v. Davenport,* 92 N. Y. 604, the court said: ''Under its system of taxation the state deals not with individuals, but with counties as representing diversions or areas of taxation. The share or quota of each county is charged against it, and it is for it to make up any deficiency in the collection.'' ''The relation between the commonwealth and the county in the matter of state tax on personal property is that of debtor and creditor, and not that of principal and agent.'' (*Commonwealth v. Philadelphia Co.* (Pa.), 10 Atl. 772.) Says Desty on Taxation, volume 11, page 1024: ''The share or quota of each county

is to be charged against it, and it is for it to make up any deficiency in the collection.'' (*County of Schuylkill v. Commonwealth,* 36 Pa. St. 524; Cooley on Taxation, p. 468; *State v. County of Multnomah,* 13 Or. 287, 10 Pac. 635; *State v. Commrs.,* 8 Wyo. 104, 55 Pac. 457; *State v. Baker Co.,* 24 Or. 141, 33 Pac. 530; *Bayonne v. State,* 41 N. J. L. 368; *State v. Bernards Township,* 42 N. J. L. 368; *Shields v. Patterson,* 55 N. J. L. 495, 27 Atl. 803; *People v. Fitch,* 148 N. Y. 71, 42 N. E. 520; *Northrup v. Hoyt,* 31 Or. 524, 49 Pac. 754; *State v. Laramie Co.,* 4 Wyo. 313, 33 Pac. 992, 35 Pac. 929.)

J. E. Gyde, for Defendants.

It is the contention of the defendants that they cannot make the levy required and for which a writ of mandate is asked against them, for the reason that to make such levy in full would, when added to other levies required by law for state purposes, fix the rate of taxation in Shoshone county for state purposes above the limit prescribed by the constitution. It is the contention of petitioners that the only levy coming within the meaning of the phrase ''for state purposes'' under our laws is the levy required to raise the *ad valorem* tax levied by the last legislature for gene˥ ˈ tate purposes. No new authorities are cited upon the points decided by the court not found in the opinion or brief of appellant.

AILSHIE, J.—This is an action prosecuted by the state board of equalization against the board of commissioners of Nez Perce county to secure a peremptory writ of mandate against the board requiring them to make and enter upon the tax-rolls a sufficient tax levy to raise Nez Perce county's proportionate share of state taxes for the year 1905, as certified by the secretary of the board of equalization. The defendants have demurred to the complaint upon the grounds that it fails to state facts sufficient to constitute a cause of action or entitle the plaintiffs to any relief. On August 31, 1905, the state auditor, who is ex-officio secretary of the

board of equalization, certified to the auditor of Nez Perce county the amount required to be raised by Nez Perce county as its share of state taxes for the year 1905 as equalized, determined and apportioned by the state board of equalization. This certificate is as follows:

"To the County Auditor of Nez Perce County, State of Idaho.

"Dear Sir: You are hereby notified that the State Board of Equalization of the State of Idaho at its regular session held at the State Capitol in the city of Boise, State of Idaho, beginning August 14, A. D. 1905, has determined and apportioned to Nez Perce County, State of Idaho, the sum of thirty-three thousand thirty-nine dollars and twenty cents ($33,039.20) as its proportion of state taxes for the year 1905, as provided by Act of the Legislature, Session Laws 1905, page 293.

## "OTHER TAXES.

"Your attention is also called to the following acts of the legislature: Session Laws 1893, page 30; 1903, page 18 and 330; 1905, page 50, 160, 279 and 280, the provisions of each of said acts require the making of special levies as in the respective acts set out. On account of such provision of said acts Nez Perce county has been charged with special taxes for the year 1905, as follows, to wit:

State wagon road bond sinking fund tax (1893)..$2,356.00
Industrial school bond sinking fund tax (1903)...   314.13
Livestock sanitary fund tax (1905) ...............   541.33
Public building endowment fund tax (1905)......   471.20
Gen'l interest and sinking fund tax (1905)...... 7,853.33
County indebtedness .......................... 7,853.33

"Very respectfully yours,

"(Signed)    ROBERT S. BRAGAW,

"State Auditor and Ex-officio Secretary of the State Board of Equalization."

The real question presented for our determination and the one upon which the county relies is this: That the aggregate amount which the state requires the defendant county to raise by tax levy for the year 1905 is in excess of five mills

upon each dollar of valuation of the taxable property of Nez Perce county as assessed and equalized for the year 1905, and it is therefore in violation of the provisions of section 9 of article 7 of the constitution. It is conceded that the total assessed valuation of the state for the year 1905 exceeds $50,000,000, and is less than $100,000,000, and therefore the maximum rate of taxation for state purposes cannot exceed five mills on each dollar valuation. The attorney general contends, however, on behalf of the state, that the limitation for purposes of taxation as fixed by section 9 of article 7 applies only to the levy for "state purposes," and that such purposes consist in maintaining and conducting the state government—legislative, executive and judicial—and the operation and maintenance of the state institutions. The attorney general insists that section 9 of article 7 has no application whatever to indebtedness incurred under the provisions of article 8 of the constitution for internal improvements and the acquiring of public grounds and the erection of state institutions. A correct solution of this proposition will be determinative of the issue presented. Upon the threshold of this discussion the defendants have cited *People v. Scott,* 9 Colo. 422, 12 Pac. 608, as a leading authority in support of their position. An examination of that case will disclose at once that the Colorado supreme court were only called upon to consider the provisions of article 10 of their constitution which very nearly corresponds with article 7 of our constitution. It will also appear that the state of Colorado has no provisions in its constitution similar to section 1 of our article 8. (See *In re State Board of Equalization,* 24 Colo. 446, 51 Pac. 493.) Again, it will be observed that the principal, if not the entire sum sought to be raised by tax levy in *People v. Scott,* was for the purpose of defraying the ordinary expenses of the state government and the maintaining and operating the state institutions. It is true, however, that the court finally arrived at the conclusion in this case that taxation for "state purposes" includes "all state purposes," and therefore comprehended every

character of revenue that the state could raise by taxation. The reasoning employed by the court in that case and the subsequent cases down to and including *In re State Board of Equalization, supra,* indicate very strongly to us that the court might have arrived at a very different conclusion had the Colorado constitution contained an article corresponding to article 8 of our constitution. The separate and distinct purposes intended by the provisions of articles 7 and 8 of our constitution have seemed clear and unambiguous to us, and while the question here under consideration was not then under discussion, still in *Stein v. Morrison,* 9 Idaho, 426, 75 Pac. 253, we attempted, in a way, to point out the separate purposes and objects of the two sections. It is there said: "A careful examination of articles 7 and 8 of our constitution discloses two separate and distinct purposes had in view in the adoption of the two articles. Article 7 defines the fiscal year, provides methods for raising revenue, exempts certain classes of property from taxation, provides for uniformity of taxation, fixes a maximum rate of taxation upon real and personal property that shall never be exceeded, provides for appropriations for current expenses, for a board of equalization, and for a system of county finances. The complete plan outlined in this article provides for the raising of revenue to meet the current expenditures. When legislative appropriations are made, they are made for the future, and to extend over a period of two years. During the time for which the expenditures are being made the revenue is being collected, and even though claims may be presented and allowed before sufficient revenue has been collected to meet the same, the complete scheme for the collection of taxes and revenue and the payment of the current expenses of the state looks to one general purpose of ending the two years for which the appropriations are made with the expenses of maintaining the state government for that period paid. On the other hand, article 8 contemplates the contracting of indebtedness, the issuance of state bonds, prohibits the loaning of the state's credit to individuals and corporations, etc. This article, differing from the other, was

entitled by the framers of the constitution thus: 'Public indebtedness and subsidies.' Between the two extremes, the one meeting the expenditure for maintenance of the state government and the other meeting expenses in case of war, to repel invasion, or suppress insurrection, the constitution has anticipated a necessity which must arise of making public improvements, erecting public buildings, educational, penal and reformatory institutions, and that for the construction of the same the state would necessarily be obliged to incur indebtedness. It authorizes the legislature to create debts not to exceed one and one-half per centum upon the assessed valuation of the taxable property therein.''

We can understand that much confusion might arise by the reading of one of these articles and not constantly keeping in mind the provisions of the other article. Article 7 is devoted to outlining a plan for raising revenue for current expenses in the running and maintaining the state government and its institutions, and it places certain limitations upon the law-making and tax-raising powers of the state government. It will be noticed by the provisions of section 9 of that article that upon the organization of the state a tax levy of ten mills on each dollar of assessed valuation was permitted, and a sliding scale was therein fixed by which the rate should constantly decrease as the assessed valuation should increase until the time arrives when the total assessed valuation of the state shall have reached $300,000,000, we cannot raise any more revenue by taxation for "state purposes" than we could raise when the total assessed valuation of the state only amounted to $45,000,000. After the assessed valuation shall have reached $300,000,000, the tax levy for "state purposes" can never exceed one and one-half mills on each dollar of assessed valuation. Now, keeping in mind the provisions of this section, and immediately turning to section 1 of article 8, we find that an ever-increasing state indebtedness is authorized at the rate of one and one-half per centum upon the assessed valuation of the taxable property in the state, no matter how large our assessed valuation may grow. While the rate of taxation for

"state purposes" is ever diminishing as the assessed valuation increases, the state "debt or debts, liability or liabilities" are authorized to forever increase as the assessed valuation increases. When our total assessed valuation was only $45,000,000, a state indebtedness of only $675,000 could be incurred by the legislature, but when the valuation reaches $300,000,000, an aggregate state indebtedness of $4,500,000 may be incurred. If, therefore, the total tax levy both for the purpose of running and maintaining the state government and its institutions and for meeting interest on the public indebtedness and providing a sinking fund must fall within the rate prescribed by section 9 of article 7, it would follow that the time will probably come when it will take the entire tax levy for "state purposes" to pay the interest upon the public indebtedness and provide a sinking fund, and that no revenue whatever would be left for maintaining and operating the state government and public institutions. Such a construction could certainly never have entered the minds of the framers of the constitution. It is clear to us that the "for state purposes" mentioned in section 9 of article 7 is for the running and current expense in carrying on and operating the different departments and institutions of the state government which is intended to be upon a cash basis as provided by section 11 of the same article. If "for state purposes" means all the revenue the state can raise by taxation, then why use these words at all? Of course all the revenue received by the state must be for state purposes in the sense that it becomes the state's money and is disbursed by the state. But the framers of the constitution evidently meant something other and different than that when they said: "The rate of taxation . . . . for state purposes shall never exceed," etc. It will also be observed that in section 1 of article 8 in prescribing the manner of incurring public and bonded indebtedness the words "for state purposes" were not used, but the words "object or work" are employed, and the bonds are authorized to be used for some single "object or work." Clearly, then, this section is providing for the raising funds for internal improvements, pub-

lic buildings, etc.　The right to incur the indebtedness under this provision of the constitution necessarily carries with it the right to raise sufficient funds to pay the interest and provide a sinking fund, but the framers of the constitution saw fit to limit that, not by the rate of taxation, but by the total amount of indebtedness which may be incurred, and have left the rate of taxation and the manner of levying and collecting it to be fixed by the legislature.　We agree with counsel at once that if indebtedness should be incurred and bonds issued under section 1 of article 8, for the purpose of raising funds for running the state government or public institutions, or for defraying bills already incurred in the maintaining of the state government and institutions or to pay deficiencies, then a tax levy to defray such bonds or indebtedness would fall within the provisions of section 9 of article 7, and go to make up the five-mill rate allowed by that section.　It is also true that, as suggested by the attorney general, any indebtedness incurred or bonds issued for the suppressing of insurrection are not covered by either article 7 or 8, but are exempted from the operations of both articles. It was stated upon the argument, and was not disputed, that $108,000 of the public indebtedness of the state comes down from territorial days, and $64,000 was incurred in suppressing insurrections and maintaining martial law.

We conclude from the foregoing that the special levies authorized and required by acts of the legislature as set forth in the state auditor's certificate hereinbefore for meeting the bond issues for state wagon road, industrial school and other public buildings and internal improvements, do not fall within the five-mill limit.　That being true, the sum required to be raised from Nez Perce county by tax levy is not in excess of the constitutional limitation, and the board of commissioners are not for that reason authorized or justified in refusing to make the levy and enter it upon their taxrolls.

The county attorney insists, however, that the act of the legislature approved March 6, 1905, entitled, "An act requiring the levying of special *ad valorem* tax by the board

of county commissioners of those several counties of the state
of Idaho which are indebted to the said state on account of
various taxes levied for special and state general purposes
since the year 1890, and prior to the year 1903,'' is unconsti-
tutional and void, as being in conflict with section 6 of ar-
ticle 7 of the constitution, which provides that ''The legis-
lature shall not impose taxes for the purposes of any county,
city, town or other municipal corporation, but may by law
invest in the corporate authorities thereof, respectively, the
power to assess and collect taxes for all purposes of such
corporation.'' It is argued that if the one-mill levy author-
ized by act of March 6, 1905, is for a county purpose, then it
is in violation of the foregoing provision of the constitution,
and if, on the other hand, it is for a ''state purpose,'' then
it falls within the five-mill limit and is unconstitutional for
being in excess of the amount authorized by section 9 of ar-
ticle 7 for ''state purposes.'' It will be seen that the act
of March 6th only authorizes and directs the board of com-
missioners to make sufficient levy, not exceeding one mill, to
pay the amount such county is *indebted* to the state. The
question does not arise here as to the amount of the indebt-
edness nor of what it consists. Questions of fact as well as
of law will probably arise in determining that, and of course
the legislature could not arbitrarily fix the amount, as that
becomes a judicial question in case the county and state do
not agree as to the amount. It is evident, however, that any
levy which the board may make for the purpose of meeting
the indebtedness of the county to the state is not a levy for
payment of *current expenses,* but is rather the payment of a
*debt* due from the county to the state. While the sum col-
lected under such a levy will be payable to the state and
become the property of the state, and in that sense is for a
state purpose, still it is not for a state purpose in the sense
in which that term is used in section 9 of article 7 of the con-
stitution. It is probable that the board could have been com-
pelled to make a levy to meet such obligation in the absence
of a statute. On the other hand, we find no provision in the
constitution that would forbid the legislature authorizing

the board of commissioners to make such a levy as in the judgment of the board will meet and liquidate its then existing indebtedness to the state. The legislature undoubtedly has such powers unless it is limited in their exercise by some provision of the constitution. We do not pretend to say, and, indeed, the case is not in such position that we can determine the fact from the record before us, whether or not it is the duty of the board of commissioners to make a sufficient levy to raise the amount called for in the certificate of the state auditor. It may be that the sum claimed is largely in excess of what is really due from the county, and the state certainly cannot constitute itself the sole judge in fixing the amount. In a proper proceeding instituted for that purpose the county may be able to show that it is indebted to the state in only a small portion of the amount claimed by the state. We therefore hold that it is the duty of the county to make a sufficient levy for the purpose of liquidating its past-due indebtedness to the state, but as to the amount of such indebtedness or the rate of levy to meet the same, we express no opinion whatever. Neither do we express any view as to the effect, if any, the case of *State v. Ada County,* 7 Idaho, 261, 62 Pac. 459, has on this particular question of county indebtedness.

The writ will issue to the effect above indicated. No costs awarded.

Stockslager, C. J., and Ailshie, J., concur.