[S.F. No. 24177. Aug. 5, 1982.]

CITY AND COUNTY OF SAN FRANCISCO, Petitioner, v. JOHN C. FARRELL, as City Controller, etc., Respondent.

COUNSEL

George Agnost, City Attorney, Burke E. Delventhal, Paula Jesson and Mark Kertz, Deputy City Attorneys, Jerome B. Falk, Jr., Peter J. Busch and Howard, Prim, Rice, Nemerovski, Canady & Pollak for Petitioner.

Stanley E. Remelmeyer, City Attorney (Torrance), Roger P. Freeman, Deputy City Attorney, Lyn R. McDougal, City Attorney (El Cajon), Daniel J. Curtin, Jr., City Attorney (Walnut Creek), Donald R. Haile, City Attorney (Watsonville), Robert W. Parkin, City Attorney (Long Beach), John R. Calhoun, Assistant City Attorney, Phil J. Shafer, Deputy City Attorney, James L. Markman, City Attorney (Brea and La Mirada), Samuel Gorlick, City Attorney (Burbank), Marvin E. Helon, City Attorney (Clovis), David J. Levy, City Attorney (Concord), Bush, Achley, Milich & Hollinan (Escalon, Oakdale and Riverbank), Gail Hutton, City Attorney (Huntington Beach), Constance K. Heneke, City Attorney (Los Altos), John J. Murphy, City Attorney (Lynwood), Elwyn L. Johnson, City Attorney (Modesto), K. D. Lyders, City Attorney (Oxnard), William J. Adams, City Attorney (Palm Springs), Evelynn M. Finn, City Attorney (Pasadena), P. Lawrence Klose, City Attorney (Petaluma), John Woodhead, City Attorney (Riverside), Ralph H. Prince, City Attorney (San Bernardino), Edwin J. Moore, City Attorney (Santa Clara), J. Dennis Crabb, City Attorney (South Lake Tahoe), Charles Haughton, City Attorney (Beverly Hills), Burke, Williams & Sorensen, Mark C. Allen, Jr., Michael W. Stamp, Jeffrey N. Haney, Acting City Attorney (Oakland), and Gerald A. Sperry, City Attorney (Stockton), as Amici Curiae on behalf of Petitioner.

Ronald A. Zumbrun, John H. Findley, James L. Meyer and Julian Rhine for Respondent.

Daniel G. Nauman, Robert S. Thompson, Thomas J. Ready, Hufstedler, Miller, Carlson & Beardsley, A. Charles Dell'Ario, Elizabeth J. Robison and Wendel, Lawlor, Rosen & Black as Amici Curiae on behalf of Respondent.

OPINION

MOSK, J.—In 1978, the voters adopted Proposition 13 (now art. XIII A of the Const.), which places limitations on the taxation powers of

state and local government. Section 4 provides, "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."[1]

In our recent decision in *Los Angeles County Transportation Com.* v. *Richmond* (1982) 31 Cal.3d 197 [182 Cal.Rptr. 324, 643 P.2d 941], we interpreted the effect of this provision as it applies to "special districts," holding that as used in section 4 that term encompasses only entities empowered to levy a property tax. The present action involves the meaning of another term used in section 4: the issue is whether a payroll and gross receipts tax, the proceeds of which are placed into a city's general fund to be used for general governmental expenditures, constitutes a "special tax" so that a two-thirds vote of the electors is required in order to adopt such a tax.

---

[1]Sections 1, 2 and 3 of article XIII A provide as follows:

"Section 1. (a) The maximum amount of any ad valorem tax on real property shall not exceed One percent (1%) of the full cash value of such property. The one percent (1%) tax to be collected by the counties and apportioned according to law to the districts within the counties.

"(b) The limitation provided for in subdivision (a) shall not apply to ad valorem taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters prior to the time this section becomes effective.

"Section 2. (a) The full cash value means the county assessor's valuation of real property as shown on the 1975-76 tax bill under 'full cash value' or, thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment. All real property not already assessed up to the 1975-76 full cash value may be reassessed to reflect that valuation. For purposes of this section, the term 'newly constructed' shall not include real property which is reconstructed after a disaster, as declared by the Governor, where the fair market value of such real property, as reconstructed, is comparable to its fair market value prior to the disaster.

"(b) The full cash value base may reflect from year to year the inflationary rate not to exceed 2 percent for any given year or reduction as shown in the consumer price index or comparable data for the area under taxing jurisdiction, or may be reduced to reflect substantial damage, destruction or other factors causing a decline in value.

"(c) For purposes of subdivision (a), the Legislature may provide that the term 'newly constructed' shall not include the construction or addition of any active solar energy system.

"Section 3. From and after the effective date of this article, any changes in State taxes enacted for the purpose of increasing revenues collected pursuant thereto whether by increased rates or changes in methods of computation must be imposed by an Act passed by not less than two-thirds of all members elected to each of the two houses of the Legislature, except that no new ad valorem taxes on real property, or sales or transaction taxes on the sales of real property may be imposed."

Section 2 was amended to its present form in 1980. The changes made are not relevant to the issue before us.

Prior to March 28, 1980, San Francisco, a charter city and county, imposed on businesses operating in the city a tax of 1.1 percent on payrolls or gross receipts. The proceeds of the tax were to be used for general revenue purposes. On April 1, 1980, ordinances increasing the tax rate to 1.5 percent became effective.[2] These increases were to expire on June 30, 1980, but prior to that date, the board of supervisors placed on the election ballot an initiative measure proposing to extend the expiration date. The voters approved the extension by a majority vote of 55 percent on June 3, 1980.

On May 29, 1980, the mayor approved a request for a supplemental appropriation of $1.1 million by the department of health to pay for improvement of the elevator system at the municipally owned Laguna Honda Hospital. The request specified that the appropriation was to come from the proceeds of the increases in the payroll and gross receipts taxes.

Respondent Farrell, the city's controller, refused to certify that funds were available for the proposed expenditure. He asserted that the increased tax adopted by the voters constituted a "special tax" as defined in article XIII A, section 4 of the Constitution, and it had not been lawfully collected because its imposition was not approved by two-thirds of the electorate, as required by that section. The taxes collected pursuant to the increase have been accruing in the city's treasury since April 1, 1980, at a rate of $17 million dollars annually.

The city filed an original petition for a writ of mandate in this court to compel Farrell to certify that funds are available from the proceeds of the increases in the payroll and gross receipts taxes for the supplemental appropriation sought by the department of health. An alternative writ was issued.

In claiming that the imposition of an increase in the payroll and gross receipts taxes does not require a two-thirds vote of the electorate, the city makes two basic arguments. It claims that section 4 does not apply to charter cities. In the alternative, it argues that the term "special taxes," as used in that provision, applies only to taxes earmarked for a specific purpose, and that since the payroll and gross receipts taxes at issue here are not so designated, their imposition is not subject to the two-thirds vote requirement. We shall conclude that the city prevails as to the second of these assertions.

[2]The measures contain an exemption for businesses with a tax liability under $500.

█ The rules of construction applicable to constitutional initiatives were set forth in detail in *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 219, 245-246 [149 Cal.Rptr. 239, 583 P.2d 1281], and it is not necessary to repeat them in detail here. In that decision, we upheld the constitutionality of various provisions of article XIII A, and in doing so we applied the familiar rules that an initiative measure should receive a practical construction, that its literal language may be disregarded to avoid absurd results and to fulfill the intent of the framers, and that ambiguities in the wording of the measure may be clarified by reference to the material presented to the voters in the ballot pamphlet and the contemporaneous construction of the measure by the Legislature.

█ We expanded on these general propositions in *Richmond* with a qualification applicable specifically to a provision which, like section 4, requires a two-thirds vote for the adoption of a tax measure. The *Richmond* case involved the adoption of a sales and use tax by the Los Angeles County Transportation District. Prior to the enactment of article XIII A, the Legislature had authorized the district to adopt such a tax for the purpose of improving public transit, upon a majority vote of the electors who voted in the election; the district had no authority to enact a property tax. The tax was approved by a majority but less than two-thirds of the voters after the effective date of the constitutional amendment. We held that the tax was valid despite the absence of a two-thirds favorable majority because the language of the section and extrinsic aids to its construction indicated that the term "special districts" in section 4 referred only to those entities authorized to levy a property tax.

In reaching this conclusion, we held that, while the requirement for a two-thirds vote as a condition for adoption of a tax is not unconstitutional (see *Gordon v. Lance* (1971) 403 U.S. 1, 6 [29 L.Ed.2d 273, 276, 91 S.Ct. 1889]), the language of section 4 must be strictly construed and ambiguities therein resolved so as to limit the measures to which the two-thirds requirement applies. In this connection, we reasoned that the two-thirds vote requirement in section 4 is inherently undemocratic; the requirement was imposed by a simple majority of the voters throughout the state upon a local entity to prohibit a majority (but less than two-thirds) of the voters of that entity from taxing themselves for programs or services which would benefit largely local residents; and the sales tax in issue in that case unlike the levy in *Gordon*, did not re-

sult in "committing ... the credit of ... generations yet unborn." (31 Cal.3d at pp. 203-205.)

Two additional observations we made in *Richmond* are relevant to the present case: We recognized that section 4 is ambiguous in various respects, and that, although its language is framed affirmatively so as to authorize local entities to adopt "special taxes," it is actually a limitation on the enactment of such taxes because it requires a two-thirds vote for their approval.

■ With this background, we turn to the meaning of the term "special taxes" in section 4. The city claims that these words refer to a tax whose proceeds are used for a special purpose, while Farrell asserts that they refer to additional or supplemental taxes other than those specifically excepted.

There can be no doubt that the term "special taxes" is ambiguous in the sense that it has been interpreted to mean different things in different contexts. One meaning frequently attributed to it by cases and statutes is a tax "collected and earmarked for a special purpose, rather than being deposited in a general fund." (See *County of Fresno* v. *Malmstrom* (1979) 94 Cal.App.3d 974, 983 [156 Cal.Rptr. 777]; *People* v. *Lodi High School Dist.* (1899) 124 Cal. 694, 697 [57 P. 660]; *Ruane* v. *City of San Diego* (1968) 267 Cal.App.2d 548, 551 [73 Cal. Rptr. 316]; *City of San Diego* v. *Atlas Hotels, Inc.* (1967) 252 Cal. App.2d 591, 592-593 [60 Cal.Rptr. 644]; Gov. Code, § 26100; Health & Saf. Code, § 850; Sts. & Hy. Code, § 8809.)[3]

Farrell, relying on some of a number of dictionary definitions of the word "special" as "supplemental to the regular" (Webster's 3d New Internat. Dict. (3d ed. 1971)), "additional" or "extra" (Funk & Wagnall's

---

[3]Other meanings attributed to these words are clearly inappropriate in the context of section 4. (E.g., a tax imposed on a particular class of taxpayers [*Scol Corp.* v. *City of Los Angeles* (1970) 12 Cal.App.3d 805, 808 (91 Cal.Rptr. 67); *City of Oceanside* v. *Pacific Tel. & Tel. Co.* (1955) 134 Cal.App.2d 361, 362 (285 P.2d 704)]; a tax levied in lieu of another tax [*First American Title Ins. & Trust Co.* v. *Franchise Tax Bd.* (1971) 15 Cal.App.3d 343, 346 (193 Cal.Rptr. 177); *County of Ventura* v. *Channel Islands State Bank* (1967) 251 Cal.App.2d 240, 246 (59 Cal.Rptr. 404)].) Sometimes the term has been used to mean "special assessment" (*Fischer* v. *County of Shasta* (1956) 46 Cal.2d 771, 774; *Los Angeles County Flood Control Dist.* v. *Hamilton* (1917) 177 Cal. 119, 130) which, properly speaking, is a charge earmarked to benefit the particular property upon which the assessment is made (*Cedars of Lebanon Hosp.* v. *County of L. A.* (1950) 35 Cal.2d 729, 748; *County of San Bernardino* v. *Flournoy* (1975) 45 Cal.App.3d 48, 51).

Standard College Dict. (1968)), claims that a "special tax" is an "extra, additional, or supplemental charge imposed . . . to raise money for public purposes."[4]

In construing the words of a statute or constitutional provision to discern its purpose, the provisions should be read together; an interpretation which would render terms surplusage should be avoided, and every word should be given some significance, leaving no part useless or devoid of meaning. (*Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 478 [156 Cal.Rptr. 14, 595 P.2d 592]; *People* v. *Gilbert* (1969) 1 Cal.3d. 475, 480 [82 Cal.Rptr. 724, 462 P.2d 580]; *Morro Hills Community Services Dist.* v. *Board of Supervisors* (1978) 78 Cal.App.3d 765, 773 [144 Cal.Rptr. 778].)

Farrell's claim that the word "special" as used in section 4 means "additional" or "extra" or "supplemental" effectively reads the word "special" out of the statute, since *any* taxes imposed by a local entity following adoption of article XIII A would be encompassed within those descriptive terms. Moreover, the language used in section 3 of the article (see fn. 1, *ante*, p. 50) indicates that the term "special taxes" in section 4 refers to some particular type of tax. Section 3 provides that state taxes enacted for the purpose of increasing revenue must be passed by a two-thirds vote of each house of the Legislature. The section states that "any" changes in state taxes to increase revenue must be enacted by the two-thirds vote. If the term "special" were to have the broad meaning suggested by Farrell, it is very likely that section 4, like section 3, would have provided that "any" changes in taxes would require the votes of an extraordinary majority. Thus, the language of section 4 appears to support the city's assertion that "special taxes" refers to a particular type of tax rather than to any and all exactions.

We turn next to Farrell's claim that the material presented to the voters in the ballot pamphlet corroborates his view that the electorate understood and intended "special taxes" in section 4 to mean all taxes. The statement of the Legislative Analyst in the ballot pamphlet that "new taxes would . . . have to be approved by two-thirds of the local voters" would appear to support Farrell's position. (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Primary Elec.

---

[4]These definitions are not the only nor indeed the first dictionary definitions of the word "special" in the authorities cited by Farrell. In both dictionaries upon which he relies, the first definition of "special" is a thing which is distinguished by some unusual or distinguishing quality or characteristic.

(June 6, 1978) p. 60.) However, this broad language is qualified by a preceding sentence which describes the initiative as allowing local governments to raise additional revenues by levying "other unspecified taxes," indicating that perhaps not all "new taxes" must be approved by a two-thirds vote. In another portion of the analysis, section 4 is described as authorizing local governments to impose "certain" nonproperty taxes with the approval of two-thirds of the voters. (*Id.* at p. 56.) If anything, this statement favors the city's view, since the use of the word "certain" implies that some but not all nonproperty taxes are subject to the two-thirds requirement.

The broadest reference in the pamphlet to the scope of section 4 is a statement by the proponents of the measure, who describe its effects as follows: "Limits property tax to 1% of market value, requires two-thirds vote of both houses of the legislature to raise any other taxes ... and requires all other tax raises to be approved by the people." (Ballot Pamp., *op. cit.* at p. 58.) Whether the voters accepted the Legislative Analyst's statement that "certain" nonproperty taxes were subject to the two-thirds requirement or this broader description of the effect of the measure we cannot know. It seems apparent, however, that the ballot pamphlet provides little authoritative guidance to the meaning of "special taxes" in section 4.[5]

Nor does legislation following the enactment of article XIII A assist in deciding the issue before us. The parties refer to sections 50075 through 50077 of the Government Code, enacted in 1979, as an indication of the Legislature's interpretation of section 4. These provisions authorize the imposition of special taxes by local entities upon the concurrence of two-thirds of the electorate voting on the measure. Section 50076 states that, as used in the article "'special tax' shall not include any fee which does not exceed the reasonable cost of providing the service or regulatory activity for which the fee is charged and which is not levied for general revenue purposes." Farrell contends that this provision implies that the Legislature viewed an exaction for general revenue purposes to be a "special tax" within the meaning of section 4. However, section 50076 refers to a fee for services and we are not here concerned with whether such a fee may exceed the cost of the service

---

[5]Other portions of the ballot pamphlet relied upon by Farrell are also uninstructive. For example, he relies on the summary of the Attorney General, which states that Proposition 13 authorizes the imposition of "special taxes ... by 2/3 vote of qualified electors." This statement does not purport to define the exactions which are included in the term "special taxes."

provided, but with whether section 4 permits the levy of a tax for general revenue purposes without a two-thirds vote. The exception provided by section 50076 sheds little light on this question.

Farrell relies heavily on certain statements we made in *Amador* regarding the purpose of section 4. In holding that the provisions of article XIII A did not violate the constitutional prohibition against an initiative measure containing more than one subject (Cal. Const., art. II, § 8, subd. (d)), we observed that the four sections of article XIII A are "functionally related in furtherance of, a common underlying purpose, namely, effective real property tax relief." (22 Cal.3d at p. 230.) We explained this relationship as follows: "[S]ince any tax savings resulting from the operation of sections 1 and 2 could be withdrawn or depleted by additional or increased state or local levies of other than property taxes, sections 3 and 4 combine to place restrictions upon the imposition of such taxes. Although sections 3 and 4 do not pertain solely to the matter of *property* taxation, both sections, in combination with sections 1 and 2, are reasonably germane, and functionally related, to the general subject of property tax relief." (*Id.* at p. 231.)

Admittedly, this language can be interpreted to mean that any tax levy (aside from the specified exceptions) comes within the two-thirds vote requirement of section 4, whether imposed for general or special revenue purposes. But there are persuasive reasons for not invoking such an interpretation. *Amador* itself warns against the use of its language as authority for propositions not before the court in that case. The opinion, stressing the "limited nature" of the inquiry involved there, cautions that interpretation or application of specific provisions of article XIII A should await cases in which the meaning of particular provisions is directly challenged. (22 Cal.3d at pp. 219-220.)

In deciding whether the payroll and gross receipts taxes come within the term "special taxes" in section 4, we are faced with considerations not before the court in *Amador*. We are asked to read the word "special" out of the phrase "special taxes," in violation of settled rules of construction and in the face of the language of section 3, which indicates that the drafters knew how to say "any" taxes when that is what they meant. Our choice here is not simply between acceptance of one of a number of different meanings of an ambiguous term in a statute, but between disregarding the word "special" altogether in section 4, or affording it some meaning consistent with the intent of the voters in

enacting the provision. Application of the rule of strict construction of provisions which require extraordinary majorities for the enactment of legislation is particularly appropriate in these circumstances.

In keeping with these principles, we construe the term "special taxes" in section 4 to mean taxes which are levied for a specific purpose rather than, as in the present case, a levy placed in the general fund to be utilized for general governmental purposes. This is a common meaning of the term, as is evident from the authorities cited above. More important, such a construction will provide the voters with the "effective" property tax relief we discussed in *Amador* to the extent the section clearly requires a two-thirds vote for the adoption of a "special tax," while ascribing some meaning to every word used in the section. (See *Los Angeles County Transportation Com. v. Richmond, supra,* 31 Cal. 3d 197, 208.)

Let a peremptory writ of mandate issue as prayed.

Bird, C. J., Newman, J., Broussard, J., and Reynoso, J., concurred.

**RICHARDSON, J.**—I respectfully dissent.

For the reasons expressed at length so recently in my dissenting opinion in *Los Angeles County Transportation Com. v. Richmond* (1982) 31 Cal.3d 197, 209-219 [182 Cal.Rptr. 324, 643 P.2d 941], I conclude that petitioner's payroll and gross receipts tax is invalid. Not having drawn the support of any of my colleagues, I believe that no useful purpose would be served by repeating my analysis here. Nonetheless, I conclude that this tax is a "special tax" which is constitutionally deficient because it was not approved by "two-thirds vote of the qualified electors" of the City and County of San Francisco (City), as required by article XIII A, section 4 of the California Constitution.

Using a very restricted interpretation of the term "special tax," the majority decides that petitioner's tax is exempt from the limitations of the constitutional provision. The majority thereby widens still further the hole which they have cut in that protective fence which the people of California thought they had constructed around their collective purse by the adoption of article XIII A, a fence which the majority first breached in *Richmond.*

In effect, petitioner City is allowed to replace the *general revenues* concededly lost to it by article XIII A's limitation on real property taxes through the simple device of a new tax, adopted by a bare majority rather than by a "two-thirds" vote of the electorate. The purpose of the new tax remains identical with that of the old—namely, to increase the *general revenue* of City. Thus, the constitutional limitations of section 4 are easily circumvented except in that extremely narrow category of taxes which the majority defines as "special." With due respect to my colleagues, it seems to me that the majority thereby rejects the clearly expressed intent of the people.

I remain mystified as to how, as the majority claims (*ante*, p. 57), such an interpretation "will provide the voters with the 'effective' property tax relief" which we identified as the purpose of article XIII A in *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 231 [149 Cal.Rptr. 239, 583 P.2d 1281].

I would deny the petition.

**KAUS, J.,** Dissenting.—As the various opinions in this case make clear, the terms of Proposition 13 itself provide no hint of what the drafters of the initiative had in mind when they used the term "special taxes" in article XIII A, section 4. As I noted in my separate opinion in *Los Angeles County Transportation Com.* v. *Richmond* (1982) 31 Cal. 3d 197, 208-209 [182 Cal.Rptr. 324, 643 P.2d 941], however, "the description and discussion of [section 4] in the election pamphlet which was before the voters suggest to me that the purpose of this section was simply to limit the authority of a city, county or special district to impose new 'special taxes' *to replace property tax revenue* that the city, county or special district lost as a result of the other portions of Proposition 13." (Orig. italics.)

If section 4 was indeed intended to restrict the ability of local entities to replace the property tax losses mandated by Proposition 13, then the interpretation of "special taxes" adopted by the court is clearly off the mark. As construed by the majority, section 4 places no limit whatsoever on the ability of local entities to levy the traditional, run-of-the-mill revenue-raising taxes for general municipal purposes, but—quite perversely—only makes it more difficult for such entities to levy much more unusual and more limited "special purpose" taxes. Since I can think of no plausible reason for the drafters to have intended such an irrational and ineffectual scheme, I must respectfully dissent.

In my view, section 4 will serve its apparent intended purpose only if the phrase "special taxes" is read to mean "new," "additional," or "supplemental" taxes which are enacted to replace tax revenue lost as a result of Proposition 13's limitations on the property tax. Contrary to the majority's suggestion, I do not believe that this interpretation reads the word "special" out of section 4 altogether. If the word "special" were completely eliminated, section 4 could be read to require a two-thirds vote of the electorate to authorize *any* tax levied by local entities after July 1, 1978, including the mere continuation of local taxes that were already in place before the adoption of Proposition 13. The inclusion of the modifier "special" in section 4 was intended to make it clear that local entities are permitted to maintain their pre-Proposition 13 nonproperty taxes without a two-thirds voter approval; only "new" or "additional"—i.e., "special"—taxes, which would inevitably replace the property tax revenue withheld by other portions of Proposition 13, are subject to the two-thirds requirement.

In sum, given the purpose of the provision, I conclude that the tax in question is a "special tax" within the meaning of section 4 of article XIII A. Accordingly, I would deny the requested writ.

Respondent's petition for a rehearing was denied September 30, 1982. Richardson, J., and Kaus, J., were of the opinion that the petition should be granted.