[Civ. No. 25503. Third Dist. Mar. 4, 1986.]

CALIFORNIA STATE EMPLOYEES' ASSOCIATION,
Plaintiff and Respondent, v.
STATE PERSONNEL BOARD et al., Defendants and Appellants;
UNIVERSAL SERVICE CONTRACTORS, Defendant and Respondent.

COUNSEL

John K. Van de Kamp, Attorney General, N. Eugene Hill, Assistant Attorney General, and Faith J. Geoghegan, Deputy Attorney General, for Defendants and Appellants.

Gary P. Reynolds and Jeffrey Fine for Plaintiff and Respondent.

Donald D. Harmata for Defendant and Respondent.

---

OPINION

**SIMS, J.**—In this case, we construe subdivision (a)(2) of Government Code section 19130,[1] which specifies certain conditions pursuant to which the State of California can contract with private firms for the performance of personal services.

Defendants and appellants, California State Personnel Board (Board), Department of General Services (General Services), and Teale Data Center (Teale) appeal from a judgment granting a writ of mandate compelling appellants (a) to refrain from entering into a contract between Teale and respondent Universal Service Contractors (Universal) providing for security guard services for Teale, or (b) to regard the contract as void if the contract has been executed. We agree with the trial court that the proposed contract violated subdivision (a)(2) of section 19130. Consequently, we affirm the judgment.

FACTS

General Services has historically supplied state civil service security guards to protect the state's Teale data processing center.

In April 1985, pursuant to a statutory mandate,[2] the Board informed respondent California State Employees' Association (CSEA) that Teale in-

---

[1]Government Code section 19130 is set forth in full as Appendix A, *post.* All further statutory references are to the Government Code unless otherwise indicated.

[2]Section 19131 requires any state agency proposing to execute a contract for personal services to achieve cost savings pursuant to section 19130, subdivision (a) to notify the Board of its intention. The Board is required to contact immediately all organizations that represent state employees who perform the type of work to be contracted so that they may be given a reasonable opportunity to comment on the proposed contract.

tended to enter into a contract with Universal pursuant to which Universal's private sector employees would replace the state's security guards at the data center.[3]

CSEA submitted written objections to the Board. As relevant here, CSEA contended the proposed contract violated subdivision (a)(2) of section 19130, which provides: "Proposals to contract out work shall not be approved solely on the basis that savings will result from lower contractor pay rates or benefits. Proposals to contract out work shall be eligible for approval if the contractor's wages are at the industry's level and do not significantly undercut state pay rates." (All further nondescript references to "subdivision (a)(2)" are to this statute.) CSEA argued the contractor's wages "significantly undercut state pay rates."

The state's security guards were paid $6.94 per hour, exclusive of benefits. Universal's guards were paid $5 per hour, exclusive of benefits. It is undisputed that Universal's wages were at the industry's level. It is further undisputed in this action that the public and private security guards had the same training and qualifications and would perform the same duties at the data center.

The Board rejected CSEA's objections and approved the contract. However, the trial court concluded Universal's wages significantly undercut the state pay rate and issued the previously described writ.

### DISCUSSION

■ The dispute between appellants and respondent CSEA concerns the proper interpretation of subdivision (a)(2).[4]

The parties first focus on the word "undercut." Appellants contend "undercut" requires an *intentional pricing down* to pay below the state pay

---

[3]The dissent correctly points out that General Services wished to phase out the security guard class. However, at oral argument, the attorney general conceded that the instant record does not show the elimination of a civil service class by the Board but rather only the reassignment of persons within a class. The power of the Board to adopt and eliminate civil service classes (see Cal. Const., art. VII, § 3, subd. (a); § 18800) is therefore not implicated in this appeal.

[4]Article VII, section 1 of the California Constitution provides: "(a) The civil service includes every officer and employee of the state except as otherwise provided in this Constitution. [¶] (b) In the civil service permanent appointment and promotion shall be made under a general system based on merit ascertained by competitive examination." No party has contended the contract at issue violates this provision; we therefore refrain from expressing any view as to its possible application in the present dispute.

rate. Although not entirely clear, appellants apparently contend a contractor would "undercut" state pay rates only if the contractor intentionally dropped his wage rate below the prevailing rate in the industry to try to get a state contract. Thus, appellants argue that as long as the contractor pays the prevailing wage for the industry, the contractor does not "undercut" state pay rates. CSEA argues the trial court correctly concluded "undercut" means simply "lower than." By this view, a contractor's wages "significantly undercut" state pay rates when they are "significantly lower than" state pay rates. For reasons that follow, we believe the trial court correctly resolved this issue by adopting the construction urged by CSEA.

We first note that courts are bound to give effect to statutes according to the usual, ordinary import of their language. (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].) As pertinent here, Webster defines "undercut" as follows: "to offer to sell at lower prices than or to work for lower wages or serve for lower fees than (a competitor)." (Webster's Third New Internat. Dict. (1981) p. 2488.) The ordinary use of "undercut" does not include "intentional pricing down." The trial court's interpretation thus gives the language its usual ordinary meaning.

Moreover, in the absence of an absurd result, we are not free to disregard ordinary rules of grammar and syntax in the interpretation of a statute. (See *Watson* v. *Superior Court* (1972) 24 Cal.App.3d 53, 60 [100 Cal.Rptr. 684].) In subdivision (a)(2), the operative noun is "wages" which "do not significantly undercut state pay rates." Unlike contractors, "wages" have no "intention." They are simply higher or lower than some other number. Appellants' construction of the statute is thus at odds with its syntax.

We are also mindful that an interpretation which would render terms of a statute surplusage should be avoided, and every word should be given some significance, leaving no part useless or devoid of meaning. (*City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47, 54 [184 Cal.Rptr. 713, 648 P.2d 935].) Appellants expressly argue that, by their interpretation, a contractor paying the prevailing wage cannot "undercut" state pay rates. However, the statute imposes conjunctive conditions of eligibility for approval of a proposal: (1) the contractor's wages must be at the industry's level, *and* (2) the wages do not significantly undercut state pay rates.[5]

---

[5]This conclusion is the basis of our disagreement with the dissent. The dissent argues the contract merits approval because most conditions imposed by section 19130 are satisfied by the contract proposal. With respect, we believe the dissent duplicates the error of the Board.

By appellants' argument, condition (2) could not occur if condition (1) was satisfied. Since appellants' interpretation makes the second condition surplusage, the interpretation is erroneous.

In support of their position, appellants cite *Curtiss-Wright Corporation* v. *McLucas* (D.N.J. 1973) 364 F.Supp. 750 and *Altemose Const.* v. *Bldg. & Const. Trades Council* (E.D.Pa. 1977) 443 F.Supp 492. However, we fail to discern how these cases help appellants. In *Curtiss-Wright,* the court, in a footnote, simply cited remarks by a single senator respecting amendments to the federal Service Contract Act (41 U.S.C. § 351 et seq.): "During the hearings on the 1972 Amendments, Senator Gurney, for example, attacked service contractors who 'ruthlessly and unconscionably' undercut wages and fringe benefits by bidding low on contracts against a better paying incumbent." (*Curtiss-Wright, supra,* 364 F.Supp. at p. 768, fn. 16.) We do not believe a snippet of legislative history respecting an amendment to an unrelated federal statute, which does not even contain language similar to that at issue here, sheds light on the problem at hand.

Similarly, in *Altemose Const.* v. *Bldg. & Const. Trades Council, supra,* the court held that defendants' counterclaims should survive summary judgment under the Sherman Act where defendants claimed plaintiffs had conspired to depress wages. (443 F.Supp. at p. 499.) We cannot see how this case aids appellants. Indeed, both *Curtiss-Wright* and *Altemose* suggest the trial court properly construed the California statute at issue. In both cases, the intentional depression of wages was treated as unlawful and opprobrious. The statute at hand proscribes proposals where wages "*significantly* undercut" state pay rates. It would be odd for the Legislature to proscribe opprobrious and possibly unlawful conduct only in the event its effects were "significant."

█ Appellants also assert the trial court failed to give proper deference to a contemporaneous administrative construction of subdivision (a)(2). When an administrative agency is charged with enforcing a particular stat-

---

The Board concluded subdivision (a)(2) was not violated because, "Although the proposed contractor's wage is lower than the State's wage, savings from this lower wage is not the sole basis for approval of the contract." By this view, subdivision (a)(2) excuses wage undercutting if the lower wage is not the sole basis for approval of the contract. We think the Board and the dissent turn subdivision (a)(2) upside down. Subdivision (a)(2) clearly provides that a necessary condition of approval of a proposal is that wages do not undercut state pay rates. If that condition is unsatisfied, the proposal is ineligible for approval regardless of compliance with other provisions of section 19130. The statute contains no exemption from the eligibility requirement where savings from the lower wage are not the sole basis of contract approval. Rather, the statute simply provides an additional ground of disqualification: "Proposals to contract out work shall not be approved solely on the basis that savings will result from lower contractor pay rates or benefits." (Subd. (a)(2).)

ute, its interpretation of the statute will be accorded great respect by the courts and will ordinarily be followed if not clearly erroneous. (*San Lorenzo Education Assn.* v. *Wilson* (1982) 32 Cal.3d 841, 850 [187 Cal.Rptr. 432, 654 P.2d 202].)

The rule is applied with most vigor to administrative regulations promulgated by an administrative body authorized to promote a statute's purposes. (See, e.g., *Norman* v. *Unemployment Ins. Appeals Bd.* (1983) 34 Cal.3d 1, 8 [192 Cal.Rptr. 134, 663 P.2d 904]; *In re Kelly* (1983) 33 Cal.3d 267, 277 [188 Cal.Rptr. 447, 655 P.2d 1282].) Conversely, where an "administrative interpretation" of a statute is found in an informal memorandum prepared for use in litigation, rather than in a regulation, the usual deference to administrative interpretation is inappropriate. (*Jones* v. *Tracy School Dist.* (1980) 27 Cal.3d 99, 107 [165 Cal.Rptr. 100, 611 P.2d 441].) In the instant case, the "administrative interpretation" cited by appellants is found in a declaration submitted in the trial court by the section manager in the Employment Services Division of the State Personnel Board who had responsibility for providing staff analysis for the review of the contract at issue here. The declarant asserts, "The contractor is not intentionally pricing down to undercut state pay rates." However, the declarant does not purport to speak for the Board itself. So far as the declaration indicates, the interpretation of the statute is that of the declarant, submitted in the instant litigation. As such, the usual deference given to a formal agency interpretation of a statute is inappropriate. (*Ibid.*)

■ "In any event, administrative construction of a statute, while entitled to weight, cannot prevail when a contrary legislative purpose is apparent. [Citations.]" (*Pacific Legal Foundation* v. *Unemployment Ins. Appeals Bd.* (1981) 29 Cal.3d 101, 117 [172 Cal.Rptr. 194, 624 P.2d 244].) Such is the case here.

■ Appellants also argue we must disregard the apparent meaning of the language of the statute because the trial court's interpretation wrongfully "renders [section 19130] a nullity." (See *Herbert Hawkins Realtors, Inc.* v. *Milheiser* (1983) 140 Cal.App.3d 334, 338 [189 Cal.Rptr. 450].) Appellants contend the purpose of section 19130 is to achieve cost savings and that contracting out on a cost saving basis will rarely, if ever, be justified if a contractor's wages must be at or near state pay rates.

We must disagree with appellants' argument at the threshold. When section 19130 is read in its entirety (see Appendix A, *post*) it is apparent the purpose of the statute is not simply to achieve cost savings but also to protect various employee policies including nondiscrimination (subd. (a)(8)), affir-

mative action (subds. (a)(4), (a)(8)), nondisplacement of civil service employees (subds. (a)(3), (b)), and maintenance of state pay rates (subd. (a)(2)). The statute is obviously a sausage produced by a legislative process that evidently stuffed interests of cost efficiency together with other interests, including those of state employees.

To be sure, cost efficiencies would be increased if private sector contractors could lower wages without limitation. However, no evidence suggests—and we are not prepared to assume—that the trial court's interpretation of the statute will eliminate private sector cost savings and therefore render section 19130 "a nullity" as appellants claim. This is so for two reasons.

The first is set forth in section 900 of the Board's Personnel Management Policy and Procedures Manual: "The cost advantages of contracting should typically result from efficiency-related factors, such as economies of scale, superior technology or lower overhead costs that cannot be offset by reasonable improvements in the State's equipment and operating procedures."[6] The second is that contractors' wages may be lower than state pay rates; a proposal is disqualified only in the event of a "significant" disparity. We therefore conclude the trial court's interpretation results in no absurdity allowing us to disregard the plain and ordinary meaning of the language of the statute. The trial court correctly concluded a contractor's wages "significantly undercut" state pay rates under subdivision (a)(2) when the wages were "significantly lower than" state pay rates.

The parties also dispute whether the comparison of wages and pay rates in subdivision (a)(2) should include or exclude fringe benefits. However, since the second sentence of subdivision (a)(2) requires a comparison of the contractor's "wages" and state "pay rates," "wages" and "pay rates" must mean the same thing, because we will not assume the Legislature intended a comparison of apples and oranges. The parties agree with this truism. The first sentence of subdivision (a)(2) refers disjunctively to "pay rates or benefits." Upon the assumption "benefits" is not surplusage (*City and County of San Francisco* v. *Farrell, supra,* 32 Cal.3d at p. 54), then "benefits" means something other than "pay rates." (See *Gonzales & Co.* v. *Department of Alcoholic Bev. Control* (1984) 151 Cal.App.3d 172, 178 [198 Cal.Rptr. 479].) Since "wages" and "pay rates" mean the same

---

[6]In 1975, the Board assumed the responsibility of reviewing contracts for personal services in order to determine whether the contracts were lawful. (See Assem. Office of Research, Government Operations Review Contracting for Services (Mar. 1982) pp. 6-7) In 1979, the Board adopted section 900 of its Personnel Management Policy and Procedure Manual describing the conditions under which the Board believed contracts for services could be let with private firms because of substantial cost savings.

thing, and since "pay rates" means something other than "benefits," the comparison of "wages" and "pay rates" in the second sentence of subdivision (a)(2) should be made by excluding fringe benefits from the computation. The trial court correctly performed the computation by excluding benefits.

 The trial court determined that Universal's wage (exclusive of benefits) of $5 per hour significantly undercut the state pay rate for state security guards of $6.94 per hour because the contractor's wages were approximately 28 percent lower that the state hourly pay rate. We are not called upon in this case to draw a precise line for all cases with respect to whether disparities will or will not be considered significant. Appellants concede that if the trial court's interpretation of subdivision (a)(2) is correct, 28 percent constitutes a "significant" disparity. We agree.

Therefore, the contract did not comply with subdivision (a)(2) and it was the duty of the Board to disapprove the contract. (See Pub. Contract Code § 10337, subd. (a).) ██ The trial court properly issued its writ.[7]

### DISPOSITION

The judgment is affirmed. Plaintiffs and respondents shall recover their costs on appeal from appellants. Defendant and respondent Universal Service Contractors shall bear its own costs on appeal.

---

[7]Defendant and respondent Universal did not appeal from the judgment. Nonetheless, as a respondent, Universal has filed a brief in this court urging us to reverse the judgment on various grounds. However, "Although it is the appellant's task to show error, there is a corresponding obligation on the part of the respondent to aid the appellate court in sustaining the judgment." (9 Witkin, Cal. Procedure (3d ed. 1985) § 492, p. 481.) Thus, it is the general rule that a respondent who has not appealed from the judgment may not urge error on appeal. (See, e.g., *Puritan Leasing Co.* v. *August* (1976) 16 Cal.3d 451, 463 [128 Cal.Rptr. 175, 546 P.2d 679]; *Henigson* v. *Bank of America* (1948) 32 Cal.2d 240, 244 [195 P.2d 777]; *Ray* v. *Parker* (1940) 15 Cal.2d 275, 282 [101 P.2d 665]; *California C.P. Growers* v. *Williams* (1938) 11 Cal.2d 233, 238 [78 P.2d 1161].) A limited exception to this rule is provided by Code of Civil Procedure section 906, which provides in pertinent part: "The respondent . . . may, without appealing from the judgment, request the reviewing court to and it may review any of the foregoing [described orders or rulings] *for the purpose of determining whether or not the appellant was prejudiced by the error or errors upon which he relies for reversal or modification of the judgment from which the appeal is taken.*" (Italics added.) The purpose of the statutory exception is to allow a respondent to assert a legal theory which may result in affirmance of the judgment. (See *Central Manufacturing District, Inc.* v. *Board of Supervisors* (1960) 176 Cal.App.2d 850, 857 [1 Cal.Rptr. 733]; 9 Witkin, *op. cit. supra,* § 249, pp. 255-256.) Here, without appealing, respondent seeks not to save the judgment but to overthrow it. This cannot be done; we will not review Universal's contentions of error. (Code Civ. Proc., § 906; *Henigson* v. *Bank of America, supra,* 32 Cal.2d at p. 244.)

Sparks, J., concurred.

**EVANS, Acting P. J.**—I dissent.

The factual background set forth in the majority opinion does not adequately establish a sufficient basis to appropriately construe Government Code section 19130 et seq.;[1] and as a consequence, I am compelled to expand the factual background giving rise to the present controversy.

Prior to May 24, 1985, Department of General Services (General Services) provided security guard service to the Stephen P. Teale Data Center in Sacramento. Prior to that date, the State Personnel Board had been advised by General Services of its decision to phase out use of the security guard class of personnel. As a result, all appropriate agencies were notified that by virtue of General Services' decision, Teale Data Center had elected to contract for its needed security services, and that defendant Universal Service Contractors had been the low responsible bidder.

As required by section 19130, defendant State Personnel Board (SPB or board) made an analysis of the circumstances and the contract, in which it applied and considered each of the elements (11) required to be met by section 19130. SPB communicated its decision to approve the cost-based contract with Universal Service Contractors and advised plaintiff, California State Employees' Association (CSEA), that the decision to contract was predicated upon General Services' decision to no longer provide security guards and furnished CSEA a copy of its detailed analysis of the contract. The board's detailed analysis of the contract was not factually challenged in the trial court nor here, and is fundamental to a proper resolution of the controversy; I accordingly set forth that analysis in full.

"The following is an analysis of the standards that must be met in a cost-based contract, as required by Government Code Section 19130:

"1. 'The proposed contract will result in an actual overall cost savings to State Government.' [§ 19130, subd. (a)(1).] The proposed contractor will provide the required service for a cost to the department of $127,020 per year, for three years. For Teale Data Center to hire its own security staff, it would cost $183,944.60 per year (see Chart A below). The savings from contracting out to the proposed vendor would be $56,924.60 per year, or $170,773.80 over the three-year period of the contract. This is a 31% savings. (See Chart B.)

---

[1]All further statutory references are to the Government Code unless otherwise indicated.

*"Chart A*

| *Cost for Teale to Hire Security Staff* | *Annual Cost* |
|---|---|

1 Full-time supervising security guard* at $1323 per month $ 21,120.00
salary plus $437 per month benefits×12 months

Security Guards—$6.94 per hour salary plus $2.19 per hour 159,957.60
benefits×17,520 hours per year

Equipment—one-time costs
 3 radios at $900 each $2,700
 1 battery charger 200
 Total one-time cost: $2,900 divided by 3 yrs. 967.00

Uniform allowance—10 staff at $190 per year for each staff 1,900.00
 Total Cost Per Year $183,944.60

---

*A new class would need to be established. The salary used here for comparison purposes is 10% above the rate for Security Guard.

*"Chart B*
*Cost Comparison*

| | Total cost per hour (17,520 hrs) | Cost per year to Teale | Amount and % saved by contracting out |
|---|---|---|---|
| Teale hire of security staff | $10.50** | $183,944.60 | |
| Proposed contract | 7.25 | 127,020.00 | |
| | | | $56,924.60 (31%) |

---

**Includes all costs listed in Chart A ($183,944.60) divided by 17,520 hours of service.

"2. 'The savings must be large enough to ensure that they will not be eliminated by private sector and State cost fluctuations that could normally be expected during the contracting period.' [§ 19130, subd. (a)(5).] The State Personnel Board policy on review of cost-based contracts indicates that a savings margin of at least 10% annually will meet this criteria. The proposed contract represents an annual savings of 31%, so this criteria is met.

"3. 'The potential for future economic risk to the State from potential contractor rate increases must be minimal.' [§ 19130, subd. (a)(9).] The proposed contractor has agreed to a set rate for the full three-year period covered by the proposed contract. Since there will be no rate increases during the life of the contract, the risk of rate increase is 'minimal'.

"4. 'The amount of savings must clearly justify the size and duration of the contracting agreement.['] [§ 19130, subd. (a)(6).] This criteria is met as the savings are not 'temporary' or 'spot' as defined by State Personnel Board policy. The savings are substantial and long term.

"5. 'The contract may not cause the displacement of civil service employees.' [§ 19130, subd. (a)(3).] No State employees will be laid off, demoted, involuntarily transferred to a new class, or reduced in time base. The Department of General Services plans to place all Security Guards who are currently at Teale Data Center in other classes and locations on a voluntary basis. General Services has obtained special permission from the Department of Personnel Administration to place their Security Guards on SROA lists to assist in the voluntary placement of their employees. Employees who do not want a change in classification will be retained in the State Police Division as Security Guards.

"6. 'Proposals to contract out work will not be approved solely on the basis that savings will result from lower contractor pay rates or benefits. Proposals to contract out work shall be eligible for approval if the contractor's wages are at the industry's level and do not significantly undercut State pay rates.' [§ 19130, subd. (a)(2).] The Bureau of Labor Statistics' report of December 1984 shows that security guards in the Sacramento area are paid an average of $5.58 per hour in wages. This study did not differentiate between armed and unarmed guards; however, in past years, the difference between armed and unarmed guard salaries was $.50 per hour more for armed guards. Therefore, the average wage for unarmed guards in the Sacramento area is assumed to be approximately $5.08 per hour. The wage under the proposed contract is $5.00 per hour and considered to be at industry's level. The State's second step pay rate for Security Guards is $6.94 per hour. (The second step would be approximately the average salary during the three-year period of the contract.) Although the proposed contractor's wage is lower than the State's wage, savings from this lower wage is not the sole basis for approval of this contract. Approval of the proposed contract is warranted by: (a) the inability of the department to continue to obtain service from the State Police after May 24, 1985; (b) the overall cost savings of 31% to the State by contracting out to the proposed vendor; (c) the proposed vendor's wage being at industry's level; and (d) the ability of the proposed vendor to provide more efficient service than the department could provide. Should any of the proposed vendor's security staff be unable to work, coverage can be provided from the pool of reserve staff. On the other hand, if a State employee cannot come to work, there is no reserve staff to cover; other Security Guards must cover at the overtime rate of pay. In addition, the proposed vendor can provide supervision more efficiently

because the supervisor is not permanently assigned onsite on a full-time basis but circulates among several of the contractor's client businesses. Supervision is available 24 hours a day as needed. Chart C below shows a comparison of the proposed vendor's cost of supervision per hour of service provided and the State's cost.

"*Chart C*

| *Proposed Vendor Cost for Supervision* | vs. | *State Cost for Supervision* |
|---|---|---|
| Up to 5 hours per day of supervision at approximately $7.25 per hour (available 24 hours a day) | | 1 supervisor 8 hours a day |
| $ 7.25 Per hour salary | | $21,120 Per year (see |
| × 5 Hours per day | | Chart A) |
| $ 36.25 Per day supv. cost | | divided by |
| × 365 Days per year | | 17,520 Hours cover- |
| $13,231.25 Per year supv. cost | | age per year |
| divided by | | $ 1.21 Cost for supv. |
| 17,520 Hours per year in con- | | per hour of |
| tract | | service provid- |
| .76 Cost for supv. per hour | | ed |
| of service provided | | |

"7. 'The contract must not adversely impact the State's affirmative action efforts.' [§ 19130, subd. (a)(4).] Since no employees will be displaced and General Services will no longer be hiring Security Guards, there will be no adverse impact on protected groups.

"8. 'All contracts approved based on cost savings must be with firms; contracting with individuals based on cost savings is not permissible.' [§ 19130, subd. (a)(10).] The proposed contractor is a firm.

"9. 'Cost-based contracts must be awarded through a well-publicized, competitive bidding process.' [§ 19130, subd. (a)(7).] The request for bids was advertised through the State Contract register. Bids were received from eight firms, four of which submitted all the required information. The proposed contractor is the low bidder of the four responsive bidders.

"10. 'Cost-based contracts shall include specific provisions pertaining to the qualifications of the staff that will perform the work under the contract, as well as assurances that the contractor's hiring practices meet applicable nondiscrimination/affirmative action standards.' [§ 19130, subd. (a)(8).] The proposed contract contains provisions concerning both the qualifications of staff and equal employment opportunity practices.

"11. 'Cost-based contracting shall not occur where the public's interest in having a particular function performed directly by State Government outweighs the potential economic advantage of contracting.' [§ 19130, subd. (a)(11).] Security guard service is not the type of service the public inherently expects to be performed by the government. The security guards under the proposed contract are unarmed and will not be performing law enforcement or emergency services functions. Law enforcement and emergency services will continue to be provided by qualified State Police Officers."

With this background, the statute may be examined pursuant to existing judicial standards for construing statutes and their application. "The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. (*California Toll Bridge Authority* v. *Kuchel,* 40 Cal.2d 43, 53 [251 P.2d 4]; *County of Alameda* v. *Kuchel,* 32 Cal.2d 193, 199 [195 P.2d 17]; *Dickey* v. *Raisin Proration Zone No. 1,* 24 Cal.2d 796, 802 [151 P.2d 505, 157 A.L.R. 324]; 82 C.J.S., Statutes, § 321, p. 560; 45 Cal.Jur.2d, Statutes, § 126, p. 634.) Moreover, 'every statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect.' (*Stafford* v. *Los Angeles etc. Retirement Board,* 42 Cal.2d 795, 799 [270 P.2d 12].) If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose. (*People* v. *Western Air Lines, Inc.* 42 Cal.2d 621, 638 [268 P.2d 723].) Such purpose will not be sacrificed to a literal construction of any part of the act. . . ." (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].)

As I apply these principles to the facts presented, I am forced to the conclusion that the trial court was wrong. Its decision was apparently the result of judicial tunnel vision. It focused on but one part of one of the eleven factual criteria and gave that one fact more than a literal construction. As a consequence, the trial court effectually rendered nugatory the total purpose of the statutory enactment.

Just as importantly, the trial court totally ignored the administrative analysis of the factual circumstances, the purpose of the statute, and the board's interpretation of each. I recognize that while an administrative construction of a statute does not acquire legal sanction merely by reason of usage, it should be accorded great respect by the courts and upheld if not obviously erroneous. (*Los Angeles* v. *Superior Court* (1941) 17 Cal.2d 707, 712 [112 P.2d 10]; see also *Los Angeles City School Dist.* v. *Simpson* (1952) 112 Cal.App.2d 70, 75 [245 P.2d 629].)

From the record presented, I conclude the trial court did not accord the board's administrative analysis any deference or consideration; more importantly, the court's resolution did not address all of the issues tendered, but rather, at the insistence of plaintiffs, focused on the single element of a comparison of the contractor's wage level to that of General Services', without consideration of any of the other criteria or the resolution of obviously conflicting statutory provisions relative to wages. Such a judicial interpretation does a disservice to all of the parties and sound judicial practice. The court had before it evidence of the factual context, the administrative agency's analysis of the wage problem, as well as the agency's overall interpretation and harmonization of those elements. The court obviously did not give the agency's decision any consideration. In *Pitts* v. *Perluss* (1962) 58 Cal.2d 824 [27 Cal.Rptr. 19, 377 P.2d 83], the Supreme Court articulated the proper legal consideration the court should give to administrative determinations and stated that parties and court should recognize the intricate and technical nature of the subject matter as well as the expertise and full technical knowledge which its administration requires. It would be presumptive of a court to claim such skill; it should not therefore superimpose its policy judgment upon the agency in the absence of an arbitrary and capricious decision. (*Id.*, at p. 832.)

The administrative decision in this instance was thorough, thoughtful, factual, and reasonable, not capricious or arbitrary.

Another fundamental rule of statutory interpretation requires that where a statute is susceptible of different interpretations, the one that leads to the more reasonable result should be followed. (*Metropolitan Water Dist.* v. *Adams* (1948) 32 Cal.2d 620, 630 [197 P.2d 543].) In addition to all of the factual criteria which precipitated the need to contract for security services, the agency carefully analyzed the wage differential in the total factual environment; the trial court did not do so. The SPB on the facts concluded the wage differential did not warrant rejection of the contract. Its conclusion was that the salaries to be paid by the successful bidder met the industry level and although the contractor's wage rate was lower than the state's wage, that fact did not warrant rejection of the contract and concluded "Approval of the proposed contract is warranted by: (a) the inability of the department to continue to obtain service from the State Police after May 24, 1985; (b) the overall cost savings of 31% to the State by contracting out to the proposed vendor; (c) the proposed vendor's wage being at industry's level; and (d) the ability of the proposed vendor to provide more efficient service than the department could provide. Should any of the proposed vendor's security staff be unable to work, coverage can be provided from the pool of reserve staff. On the other hand, if a State employee cannot

come to work, there is no reserve staff to cover; other Security Guards must cover at the overtime rate of pay. In addition, the proposed vendor can provide supervision more efficiently because the supervisor is not permanently assigned onsite on a full-time basis but circulates among several of the contractor's client businesses. Supervision is available 24 hours a day as needed.''

Such an interpretation and application obviously carries out the intent and purpose of the Legislature and effectuates the purpose of the law. (*Select Base Materials* v. *Board of Equalization, supra,* 51 Cal.2d at p. 645.) It is fundamental in such cases that a statutory construction which sensibly resolves an apparent controversy is preferred to one which renders statutory purpose or language meaningless. (*Wells* v. *Marina City Properties, Inc.* (1981) 29 Cal.3d 781, 788 [176 Cal.Rptr. 104, 632 P.2d 217].)

In the context of the needs presented by virtue of General Services' decision and Teale Data Center's requirement of security service, the statute required a broad rather than literal interpretation in order to uphold the usefulness of the statute and give its purpose meaning and effect and avoid an absurd result. (*Herbert Hawkins Realtors, Inc.* v. *Milheiser* (1983) 140 Cal.App.3d 334, 338 [189 Cal.Rptr. 450].)

Moreover, I consider the trial court's interpretation of the term "undercut" as used in section 19130, subdivision (a)(2), to have effectually rendered the statute meaningless and purposeless. The statutory language which requires the contractor's pay scale to be at the industry level, which Universal Service Contractor's was, but at the same time virtually meet the state pay level, creates a conflict and results in a language surplusage in the statute. (§ 19130, subd. (a)(2).)

The trial court decision seems to ignore the semantics involved in the consideration of the term "undercut" as used in section 19130, subdivision (a)(2). The definition of the term in this context is to accept or offer to accept a lower wage than is standard or general. The definition implies a deliberate act to abridge or depress a wage level. Such evidence is not demonstrated by the record; rather, the contrary appears to clearly be the case. The question then becomes which of the conflicting provisions must yield. I am firmly convinced that to achieve the overall legislative purpose, the administrative decision correctly resolved that problem.

I would reverse the judgment.

APPENDIX A

Government Code section 19130 provides as follows:

"The purpose of this article is to establish standards for the use of personal services contracts.

"(a) Personal services contracting is permissible to achieve cost savings when all the following conditions are met:

"(1) The contracting agency clearly demonstrates that the proposed contract will result in actual overall cost savings to the state, provided that:

"(A) In comparing costs, there shall be included the state's additional cost of providing the same service as proposed by a contractor. These additional costs shall include the salaries and benefits of additional staff that would be needed and the cost of additional space, equipment, and materials needed to perform the function.

"(B) In comparing costs, there shall not be included the state's indirect overhead costs unless these costs can be attributed solely to the function in question and would not exist if that function was not performed in state service. Indirect overhead costs shall mean the pro rata share of existing administrative salaries and benefits, rent, equipment costs, utilities and materials.

"(C) In comparing costs, there shall be included in the cost of a contractor providing a service any continuing state costs that would be directly associated with the contracted function. These continuing state costs shall include, but not be limited to, those for inspection, supervision, and monitoring.

"(2) Proposals to contract out work shall not be approved solely on the basis that savings will result from lower contractor pay rates or benefits. Proposals to contract out work shall be eligible for approval if the contractor's wages are at the industry's level and do not significantly undercut state pay rates.

"(3) The contract does not cause the displacement of civil service employees. The term 'displacement' includes layoff, demotion, involuntary transfer to a new class, involuntary transfer to a new location requiring a change of residence, and time base reductions. Displacement does not include changes in shifts or days off, nor does it include reassignment to other positions within the same class and general location.

"(4) The contract does not adversely affect the state's affirmative action efforts.

"(5) The savings shall be large enough to ensure that they will not be eliminated by private sector and state cost fluctuations that could normally be expected during the contracting period.

"(6) The amount of savings clearly justify the size and duration of the contracting agreement.

"(7) The contract is awarded through a publicized, competitive bidding process.

"(8) The contract includes specific provisions pertaining to the qualifications of the staff that will perform the work under the contract, as well as assurance that the contractor's hiring practices meet applicable nondiscrimination, affirmative action standards.

"(9) The potential for future economic risk to the state from potential contractor rate increases is minimal.

"(10) The contract is with a firm. A 'firm' means a corporation, partnership, nonprofit organization, or sole proprietorship.

"(11) The potential economic advantage of contracting is not outweighed by the public's interest in having a particular function performed directly by state government.

"(b) Personal services contracting also shall be permissible when any of the following conditions can be met:

"(1) The functions contracted are exempted from civil service by Section 4 of Article VII of the California Constitution, which describes exempt appointments.

"(2) The contract is for a new state function and the Legislature has specifically mandated or authorized the performance of the work by independent contractors.

"(3) The services contracted are not available within civil service, cannot be performed satisfactorily by civil service employees, or are of such a highly specialized or technical

nature that the necessary expert knowledge, experience, and ability are not available through the civil service system.

"(4) The services are incidental to a contract for the purchase or lease of real or personal property. Contracts under this criterion, known as 'service agreements,' shall include, but not be limited to, agreements to service or maintain office equipment or computers that are leased or rented.

"(5) The legislative, administrative, or legal goals and purposes cannot be accomplished through the utilization of persons selected pursuant to the regular civil service system. Contracts are permissible under this criterion to protect against a conflict of interest or to insure independent and unbiased findings in cases where there is a clear need for a different, outside perspective. These contracts shall include, but not be limited to, obtaining expert witnesses in litigation.

"(6) The nature of the work is such that the Government Code standards for emergency appointments apply. These contracts shall conform with Article 8 (commencing with Section 19888) of Chapter 2.5 of Part 2.6.

"(7) State agencies need private counsel because a conflict of interest on the part of the Attorney General's office prevents it from representing the agency without compromising its position. These contracts shall require the written consent of the Attorney General, pursuant to section 11040.

"(8) The contractor will provide equipment, materials, facilities, or support services that could not feasibly be provided by the state in the location where the services are to be performed.

"(9) The contractor will conduct training courses for which appropriately qualified civil service instructors are not available, provided that permanent instructor positions in academies or similar settings shall be filled through civil service appointment.

"(10) The services are of such an urgent, temporary, or occasional nature that the delay incumbent in the implementation under civil service would frustrate their very purpose.

"(c) All persons who provide services to the state under conditions the board determines constitute an employment relationship shall, unless excepted from civil service by Section 4 of Article VII of the California Constitution, be retained under an appropriate civil service appointment."