(No. 6763. March 21, 1940.)

FLOYD W. LYONS, Appellant, v. C. A. BOTTOLFSEN, as Governor and Chairman of the Toll Bridge Committee; E. W. SINCLAIR, as Commissioner of Public Works and Secretary of the Toll Bridge Committee; MYRTLE P. ENKING, as Treasurer; and CALVIN E. WRIGHT, as Auditor, Respondents.

[101 Pac. (2d) 1.]

James R. Bothwell and Harry Povey, for Appellant.

J. W. Taylor, Attorney General, and R. P. Parry and Harry Benoit, Special Assistants to the Attorney General, for Respondents.

GIVENS, Presiding Justice.—Chapter 223, 1939 Session Laws, page 484, provides for a Toll Bridge Committee to be composed of the Governor, and four citizens of the state appointed by him with the Commissioner of Public Works as secretary.

The commissioner is authorized to acquire by purchase, agreement, condemnation or otherwise any toll bridge in the state at such amount as shall be determined and fixed by the committee, not to exceed $500,000. Prior to such purchase the commissioner shall cause an independent written appraisal of the value of such bridge to be made by an appraiser or appraisers appointed by him and filed in the Department of Public Works and with the Toll Bridge Committee.

Issuance and sale by the Governor and Treasurer of treasury notes of the state bearing interest not to exceed 3 per cent per annum payable semi-annually are authorized. The proceeds of the notes are appropriated via a "Toll Bridge Acquisition Fund" for the acquisition of toll bridges in accordance with the statute. Said notes are to be retired by a levy of one mill per gallon on all motor fuel sold in the state; such levy being first covered into a "Toll Bridge Treasury Note Redemption Fund."

For each six months' period of the collection of said tax enough thereof is allocated therefrom to pay the interest on all notes outstanding and redemption of notes falling due in said half year, the balance received from said levy for each semi-annual period to go to the State Highway Fund. Adequate, full and complete provision is made for the collection of said tax by the dealers in motor fuel and transmittal through the Department of Law Enforcement to the State Treasurer. Such dealers are allowed to deduct the amount of the tax from their income tax returns to the state.

Based on the amount of motor fuels sold in 1937 and 1938 the legislature estimated at least $45,000 would be collected semi-annually by such excise tax. Under such estimate the notes issued, the subject matter of the suit herein amounting to $482,000, being the fixed price of the bridge contracted to be purchased, would be retired in approximately six and one-half years and maturity amounts and dates were accordingly specified in the issue involved herein.

A separate appropriation of $2,000 is made for the expenses of the commission.

It is further provided the levy of such tax shall be irrevocable and irrepealable until said notes are paid in full.

Appellant as a citizen, property owner, taxpayer ·of the state and purchaser and consumer of motor fuels therein, on behalf of himself and all others similarly situated, sued to restrain, on constitutional grounds, all proceedings in connection with the purchase of the "rim-to-rim" cantilever toll bridge spanning the precipitously walled Snake River Canyon, the boundary line between Twin Falls and Jerome counties, comprising rich, fertile, productive, progressive agricultural areas. The bridge was constructed and is now owned and operated by the Twin Falls-Jerome Intercounty Bridge Company, a Washington corporation qualified to do business in the state, under a franchise from said counties dated December 31, 1925, as amended, July 16, 1926.

The highways at both ends of the bridge are state highways but because it is a toll bridge it is asserted the federal Government will not aid in the construction, maintenance or improvement of said highways with federal funds.

288

 First, it is contended the title[1] of the statute is insufficient, ambiguous and misleading and the statute embraces more than one subject not properly expressed in the title.

A statute must embrace but one subject and matters reasonably connected therewith (*State v. Pioneer Nurseries Co.*, 26 Ida. 332, 143 Pac. 405; *Smallwood v. Jeter*, 42 Ida. 169, 244 Pac. 149) but where all provisions relate to and have a natural connection with the same subject they may be united

"AN ACT
[1]"RELATING TO THE ACQUISITION OF TOLL BRIDGES; CREATING A TOLL BRIDGE COMMITTEE AND PRESCRIBING ITS DUTIES, THE MANNER OF VOTING, FILLING VACANCIES, AND THE TIME, PLACE AND MANNER OF HOLDING MEETINGS; PROVIDING THE MANNER OF ACQUISITION OF TOLL BRIDGES BY THE COMMISSIONER OF PUBLIC WORKS; AND LIMITING THE COST THEREOF; AUTHORIZING THE ISSUANCE OF TREASURY NOTES OF THE STATE OF IDAHO IN A PRINCIPAL SUM NOT EXCEEDING $500,000.00 AND FOR THE SALE THEREOF FOR THE USE OF THE TOLL BRIDGE ACQUISITION FUND; ANTICIPATING THE REVENUES FROM AN EXCISE TAX ON MOTOR FUELS; PRESCRIBING THE FORM, TERMS AND CONDITIONS OF SAID TREASURY NOTES AND THE MANNER OF FIXING THE MATURITY DATES THEREOF AND THE PROCEDURE TO BE FOLLOWED IN THE ISSUANCE AND SALE THEREOF; PRESCRIBING THE CONDITIONS UNDER WHICH THE SALE OF SUCH NOTES MAY BE MADE AND THE CANCELLATION THEREOF IF SALE IS NOT COMPLETED; PRESCRIBING THE HANDLING AND USE OF THE FUNDS DERIVED FROM THE SALE OF SUCH TREASURY NOTES; LEVYING A LICENSE TAX OF ONE MILL PER GALLON ON ALL MOTOR FUELS STORED, SOLD, DISTRIBUTED AND/OR USED FOR CONSUMPTION IN THE STATE OF IDAHO; PRESCRIBING THE DEFINITIONS OF 'MOTOR FUELS', 'DEALERS' AND OTHER TERMS; PROVIDING FOR THE TIME AND MANNER OF COLLECTION OF SUCH LICENSE TAX BY THE COMMISSIONER OF LAW ENFORCEMENT OF THE STATE OF IDAHO AND THE DISPOSITION OF SUCH LICENSE TAX; PROVIDING THAT SUCH LICENSE TAX MAY BE OFF-SET AGAINST THE INCOME TAX OF THE DEALER IN MOTOR FUELS; DEFINING THE TERM 'COMMISSIONER OF FINANCE'; PROVIDING PENALTIES FOR VIOLATION OF THIS ACT; PRESCRIBING THE DUTIES OF THE DEPARTMENT OF LAW ENFORCEMENT AND THE COMMISSIONER OF LAW ENFORCEMENT; PRESCRIBING

in one statute. (*Pioneer Irr. Dist. v. Bradley*, 8 Ida. 310, 68 Pac. 295, 101 Am. St. 201; *Chambers v. McCollum*, 47 Ida. 74, 272 Pac. 707; *Johnson v. Diefendorf*, 56 Ida. 620, 57 Pac. (2d) 1068.) The title need not be an index to the statute. (*Federal Reserve Bank v. Citizens' B. & T. Co.*, 53 Ida. 316, 23 Pac. (2d) 735; *Idaho Gold Dredging Co. v.*

THE PURPOSES AND USES OF SUCH LICENSE TAX AND MAKING AN APPROPRIATION THEREFOR; CREATING A TOLL BRIDGE ACQUISITION FUND AND MAKING OR APPROPRIATING SAID FUND; CREATING THE TOLL BRIDGE TREASURY NOTE REDEMPTION FUND AND THE TIME, MANNER AND PROCEDURE THEREFOR; PROVIDING FOR THE REPAYMENT OF THE PRINCIPAL AND INTEREST OF SAID TREASURY NOTES AND THE PROCEDURE THEREFOR; MAKING AN APPROPRIATION OF THE PROCEEDS OF THE TOLL BRIDGE TREASURY NOTE REDEMPTION FUND FOR THE PAYMENT OF SAID TREASURY NOTES AND PRESCRIBING THE EFFECT THEREOF; PROVIDING FOR THE DISPOSITION OF THE EXCESS FUNDS IN THE TOLL BRIDGE ACQUISITION FUND; MAKING AN APPROPRIATION FOR THE ENFORCEMENT OF THE LICENSE TAX PROVIDED FOR IN THIS ACT; DEFINING THE TERMS 'COMMISSIONER OF LAW ENFORCEMENT' AND 'DEPARTMENT OF LAW ENFORCEMENT'; PRESCRIBING THE DUTIES OF THE STATE TREASURER AS TO PAYMENT AND CANCELLATION OF THE TREASURY NOTES; MAKING AN APPROPRIATION FROM THE TOLL BRIDGE ACQUISITION FUND FOR THE PAYMENT OF INTEREST FALLING DUE UPON ANY TREASURY NOTES, ON JULY 1, 1939, AND DECEMBER 31, 1939; MAKING AN APPROPRIATION FOR THE PAYMENT OF THE EXPENSE INCIDENT TO THE ISSUANCE AND SALE OF SAID TREASURY NOTES AND THE EXPENSE INCURRED BY THE TOLL BRIDGE COMMITTEE; MAKING THE ISSUANCE AND SALE OF SAID TREASURY NOTES AN IRREVOCABLE CONTRACT BETWEEN THE STATE OF IDAHO AND THE OWNER OR HOLDER OF SAID NOTES AND PROVIDING THAT SAID EXCISE TAX LEVIED ON MOTOR FUELS OF ONE MILL PER GALLON SHALL NOT BE REDUCED OR REPEALED UNTIL SAID TREASURY NOTES ARE FULLY PAID; MAKING AN APPROPRIATION OF THE PROCEEDS OF SAID TREASURY NOTES, AND PRESCRIBING THE TERMS UNDER WHICH THE COMMISSIONER OF PUBLIC WORKS MAY PURCHASE TOLL BRIDGES; PROVIDING THAT THIS ACT MAY BE CITED AS 'THE TOLL BRIDGE ACQUISITION ACT'; PROVIDING A SAVING CLAUSE AND DECLARING AN EMERGENCY."

*Balderston,* 58 Ida. 692, 78 Pac. (2d) 105.) All that is required is that the subject be expressed in the title and the contents be germane to the purposes recited in the title. (*Turner v. Coffin,* 9 Ida. 338, 74 Pac. 962; *Settlers' Irr. Dist. v. Settlers' Canal Co.,* 14 Ida. 504, 94 Pac. 829; *Andrews v. Board of Commrs. of Ada County,* 7 Ida. 453, 63 Pac. 592.)

This title does not offend.

The subject matter of this statute does not come within the prohibitions of article 3, section 19, of the Constitution as to local and special legislation. Hence the legislature was free from such restrictions in enacting this statute. (*Butler v. City of Lewiston,* 11 Ida. 393, 83 Pac. 234.)

Bridges are part of the state highway system. (*Bonneville County v. Bingham County,* 24 Ida. 1, 132 Pac. 431; secs. 39-101 and 39-701, I. C. A.) The legislature may equally authorize the highway department to purchase or build bridges. (*Wiggin v. City of Lewiston,* 8 Ida. 527, 537, 69 Pac. 286; *Thomas v. City of Gooding,* 27 Ida. 624, 149 Pac. 1064; *Bradbury v. City of Idaho Falls,* 32 Ida. 28, 177 Pac. 388.) Such purchase is not lending or pledging the credit of the state to a private person or corporation. (*Ada County v. Wright,* 60 Ida. 394, 92 Pac. (2d) 134.)

Prior to the time this statute was passed a motor fuels tax of five cents per gallon was in force (Sess. Laws 1933, chap. 46, p. 69), the proceeds therefrom used by the highway department for the construction, maintenance and improvement of highways and bridges. (Title 39, chap. 21, I. C. A., and amendments thereto.)

While it is contended the statute herein results in duplicate taxation (art. 7, sec. 5, Const., and chap. 46, Sess. Laws 1933) it is not contended the sum of the two or 5 and 1/10 cents per gallon is confiscatory.

While this one mill tax is specifically set aside for the purchase of toll bridges alone, the amount of the motor fuels tax for highway purposes (including bridges), is in effect merely increased, and there is no duplicate taxation.

Furthermore, article 7, section 5, does not apply to excise taxes which this is expressly so declared in the statute to be. (*Diefendorf v. Gallet,* 51 Ida. 619, 10 Pac. (2d) 307; *Idaho*

*Gold Dredging Co. v. Balderston, supra; Johnson v. Diefendorf,* 56 Ida. 620, 627, 57 Pac. (2d) 1068.)

■ Appellant further contends to allow the dealer to offset the amount of the tax on his income tax is in violation of section 5, article 7 and section 13, article 1, of the Constitution. In the first place these sections likewise do not apply to excise taxes. In the second place, if such offsets be unconstitutional it would not affect the balance of the act because they are separable. (*J. C. Penney Co. v. Diefendorf,* 54 Ida. 374, 32 Pac. (2d) 784; *Johnson v. Diefendorf, supra,* at page 633.) In the third place the tax collected by the dealer is no part of the dealer's income, it is a tax paid by the consumer, collected by the dealer and transmitted by him through the Department of Law Enforcement to the State Treasury. To not allow the dealer this credit would result in the state taxing its own tax.

■■ Appellant contends the treasury notes herein constitute an indebtedness of the state and with the method of retirement violate article 8, section 1 of the Constitution and also section 11, article 7, section 13, article 7, section 17, article 3 and section 2, article 8. Respondents relying on *State v. Eagleson,* 32 Ida. 276, 181 Pac. 934 and other authorities, urge it is not an indebtedness of the state.

A careful analysis of *State v. Eagleson, supra,* discloses that the court considered advances of the character embodied in the treasury notes therein involved were permissible under article 7, sections 9 and 11, and as not constituting a liability or indebtedness coming under article 8, section 1, only under the restrictions in said sections of article 7; namely, restrictions as to amount, 10 mills, kind of tax, *ad valorem,* and time, each of the two years within the legislative biennium.

While there are many continuing appropriations they do not involve continuing irrevocable obligations, only that the money coming into the particular fund or for a particular purpose is so appropriated until changed.

If an obligation is incurred which is irrevocable and requires for payment levies beyond the legislative biennium it is a debt under article 8, section 1, and not merely advances against annual levies within such biennium under article 7.

The obligations provided for herein extend payment therefor beyond such biennium, hence the doctrine of the Eagleson case does not justify a holding that these are permissible advances not coming under article 8, section 1.

We are not unmindful that there are authorities which seemingly do support respondents' contention that advances against excise taxes beyond the biennium do not constitute an indebtedness or obligation of the state which come within the purview of article 8, section 1. (*Alabama State Bridge Corp. v. Smith*, 217 Ala. 311, 116 So. 695; *State ex rel. Richards v. Moorer*, 152 S. C. 455, 150 S. E. 269; *State ex rel. Crawford v. Stevens*, 173 S. C. 149, 175 S. E. 213; *Ajax v. Gregory*, 177 Wash. 465, 32 Pac. (2d) 560; *Moses v. Meier*, 148 Or. 185, 35 Pac. (2d) 981; *Johnson v. McDonald*, 97 Colo. 324, 49 Pac. (2d) 1017; *State ex rel. Capital Building Com. v. Connelly*, 39 N. M. 312, 46 Pac. (2d) 1097, 100 A. L. R. 878; *State ex rel. Dragstedt v. State Board of Education*, 103 Mont. 336, 62 Pac. (2d) 330.)

Not only are some of these authorities based on different factual foundations, clearly distinguishing them, but their reasoning as applied to the situation herein does not impress us as sound or applicable when we consider what is the plain and clear underlying philosophy and intent of the framers of the Constitution, namely to definitely limit the state's indebtedness and keep the state and its constituent political subdivisions on a cash basis. (Art. 4, secs. 8, 11, 17, 18; art. 5, sec. 10; art. 7, secs. 9, 11, 13, 15; art. 8, secs. 1 and 3; vol. 1, Constitutional Debates, pp. 561, 584.) We find ample support for such conclusion in *State v. State Highway Com.*, 89 Mont. 205, 296 Pac. 1033, *In re Senate Resolution No. 2*, 94 Colo. 101, 31 Pac. (2d) 325, and *Boswell v. State*, 181 Okl. 435, 74 Pac. (2d) 940.)

The complaint alleges and the demurrer admits:

''That the debts and liabilities of the State of Idaho, singly or in the aggregate, have not exceeded the sum of $1,500,-000.00 at any time on or since the 8th day of June, 1939, but that neither the purchase of the said toll bridge nor the indebtedness accruing on account thereof, nor the issuance or

sale of said treasury notes, nor the incurring of the indebtedness evidenced thereby, has been submitted to the people of the State of Idaho at any election whatever."

The records of the State Auditor's office show an indebtedness of $948,500 on March 9 and 11, 1939, the later date the statute under consideration was passed and became effective and the date decisive as to the amount of state indebtedness then in existence. (*Lewis v. Brady*, 17 Ida. 251, 104 Pac. 900, 28 L. R. A., N. S., 149.)

Our attention has been called to chapter 206 of 1939 Session Laws, page 415, as an emergency statute effective March, 9th, authorizing the issuance of $240,000 of state bonds for construction, etc., of buildings and improvements at State Hospital North at Orofino and State Hospital South at Blackfoot, the Deaf and Blind School at Gooding and State Historical Society. Under *Lewis v. Brady, supra,* though no bonds have as yet actually been issued under this chapter, this indebtedness must be added to the $984,500 as of March 11th, making a total indebtedness of that date of $1,224,500.

On the same day (March 11, 1939), the statute herein considered (chap. 223 of 1939 Sess. Laws) was passed, the legislature passed chapter 252, 1939 Session Laws, page 627 (both being emergency measures and signed by the Governor that day), authorizing $1,000,000 Highway Fund tax anticipation notes to be repaid similarly to those provided for in chapter 223, except payment is to come out of the five cent motor fuel excise tax theretofore and now in force.

For the above reasons these later notes must be classed not as mere advances but as constituting a debt or liability coming under article 8, section 1, and the amount of these notes, $1,000,000, regardless of the passage of chapter 223, added to the debt thus considered to then exist, i. e., $1,224,500, would exceed the limit of article 8, section 1, by $224,500, hence chapter 252, though not now directly before us, could not prevail against chapter 223, which added to the then existing indebtedness of $1,224,500 would have aggregated only $1,724,-500, within the limit of $2,000,000 permitted by article 8, section 1.

Hence chapter 223 may be sustained not as allowable advances such as sanctioned in *State v. Eagleson, supra,* but as a debt or liability coming under article 8, section 1, but not exceeding the constitutional debt limit on the date of the passing of said chapter.

But it is further urged repayment by a prospective excise tax on motor fuels is so uncertain that the credit of the state will be impaired, and section 1, article 8, authorizes indebtedness repayable only by *ad valorem* taxes. *Stein v. Morrison,* 9 Ida. 426, 75 Pac. 246, clearly held that within the limits of section 1, article 8, the legislature could incur indebtedness without a vote of the people. To what extent other provisions apply the court did not say. But it did say other taxes than *ad valorem* were clearly contemplated. (*State v. Jones,* 9 Ida. 693, 699, 75 Pac. 819.)

" . . . . The right to incur the indebtedness under this provision of the constitution necessarily carries with it the right to raise sufficient funds to pay the interest and provide a sinking fund, but the framers of the constitution saw fit to limit that, not by the rate of taxation, but by the total amount of the indebtedness which may be incurred, and have left the rate of taxation and the manner of levying and collecting it to be fixed by the legislature." (*Gooding v. Proffitt,* 11 Ida. 380, 389, 83 Pac. 230.)

Based on the experience of the past years the prospective returns from this source are not so uncertain or speculative as to authorize us in saying the legislature was powerless to thus provide for the retirement of this indebtedness. (*Davis v. Childers,* 181 Okl. 468, 74 Pac. (2d) 930; *Martin v. State Highway Com.,* 107 Mont. 603, 88 Pac. (2d) 41, 45.)

If possible the statute must be sustained. (*State v. Taylor,* 58 Ida. 656, 78 Pac. (2d) 125; *State v. Rayner,* 60 Ida. 706, 96 Pac. (2d) 244; *Diefendorf v. Gallet,* 51 Ida. 619, 624, 10 Pac. (2d) 307.)

Provision for retirement by a motor fuels tax places no greater burden on the state than could have been done otherwise. Pledging future excise gas tax is no more binding on future legislatures than requiring a levy of *ad valorem* taxes to pay bonded indebtedness. (*State v. Connelly,* 39

N. M. 312, 46 Pac. (2d) 1097, 100 A. L. R. 878; *Johnson v. McDonald,* 97 Colo. 324, 49 Pac. (2d) 1017; *Milburn v. Childers,* 178 Okl. 84, 61 Pac. (2d) 1047.)

Article 7, sections 9 and 11 have to do with biennial appropriations and not with indebtedness extending beyond such two-year period falling under the provisions of article 8, section 1, but the two articles must be read and considered together for this reason: article 7, section 11, thus provides:

"No appropriation shall be made, nor any expenditure authorized by the legislature, whereby the expenditure of the state during any fiscal year shall exceed the total tax then provided for by law, and applicable to such appropriation or expenditure, unless the legislature making such appropriation shall provide for levying a sufficient tax, not exceeding the rates allowed in section nine of this article, *to pay such appropriation or expenditure within such fiscal year.* This provision shall not apply to appropriations or expenditures to surpress insurrection, defend the state, or assist in defending the United States in time of war."

An indebtedness incurred under article 8, section 1, is of course not required to be paid within the fiscal year but may be, if exceeding the two million limit extended to twenty years. If the limitations in article 8, section 1, apply to any indebtedness within the two million limit but beyond the biennium no restriction is contained in article 8, section 1[2] as to

---

[2] Art. 8, sec. 1:

"The legislature shall not in any manner create any debt or debts, liability or liabilities, which shall singly or in the aggregate, exclusive of the debt of the territory at the date of its admission as a state, and exclusive of debts or liabilities incurred subsequent to January 1, 1911, for the purpose of completing the construction and furnishing of the state capitol at Boise, Idaho, and exclusive of debt or debts, liability or liabilities incurred by the eleventh session of the legislature of the state of Idaho, exceed in the aggregate the sum of two million dollars, except in case of war, to repel an invasion or suppress an insurrection, unless the same shall be authorized by law, for some single object of work, to be distinctly specified therein, which shall provide ways and means, exclusive of loans, for the payment of the interest on such debt or liability as it falls due, and also for the payment and

how repayment is to be made, i. e., by *ad valorem,* excise tax or otherwise.

The court may take judicial notice that a large part of the expenses[3] of the state government is born by excise taxes,[4] not *ad valorem,* yet if article 7, section 11, be construed to demand sufficient levy by and of *ad valorem* taxes to insure all biennial appropriations, thus literally applied all excise tax applications might be unconstitutional. It does not seem reasonable that the framers of the Constitution or the people in adopting it intended to forever saddle the burdens of state

discharge of the principal of such debt or liability within twenty years of the time of the contracting thereof, and shall be irrepealable until the principal and interest thereon shall be paid and discharged. But no such law shall take effect until at a general election it shall have been submitted to the people, and shall have received a majority of all the votes cast for or against it at such election, and all moneys raised by the authority of such laws shall be applied only to specified objects therein stated, or to the payment of the debt thereby created, and such law shall be published in at least one newspaper in each county or city, and county, if one be published therein, throughout the state for three months next preceding the election at which it is submitted to the people. The legislature may at any time after the approval of such law, by the people, if no debts shall have been contracted in pursuance thereof, repeal the same."

3 Summary of revenue and disbursements for 1938 as disclosed by the Auditor's records:

| | |
|---|---|
| Ad valorem taxes (levied) | $ 1,226,141.31 |
| Grants & endowment fund earnings | 3,703,212.66 |
| Excise revenues | 16,833,336.08 |
| TOTAL | $21,762,690.05 |
| Cost of State Government | $20,806,470.90 |
| Surplus | 956,319.15 |

4 Beer Tax, Sess. Laws 1935, chap. 132, p. 312; Chain Store Tax, Sess. Laws 1935, chap. 113, p. 179; Express Company Tax, Title 61, chap. 21, I. C. A.; Income Tax, Title 61, chap. 24, I. C. A.; Inheritance Tax, Title 14, chap. 4, I. C. A.; Kilowatt Tax, Title 61, chap. 22, I. C. A.; Mines Tax, Sess. Laws 1935, chap. 65, p. 182; Motor Fuel Tax, Title 48, chap. 7, I. C. A.; Motor Vehicle Caravan Tax, Sess. Laws 1935, 2d Extraordinary Session, chap. 2, p. 6.

government on the real and personal property of the state by *ad valorem* taxes.

Appellant contends the contract is void for irregularity in the appointment of the committee members and subsequent proceedings in these particulars: (1) That it is an unconstitutional delegation of authority under article 2, section 1, and article 3, section 1, of the Constitution; (2) that appointment of the commissioners by the Governor without the consent of the Senate was in violation of article 4, section 6; (3) that the act is dependent on action by the Commissioner of Public Works and the state had none during any of the proceedings herein, only an *acting* commissioner; (4) that the committee had no power to fix the value of the bridge because it had no appraisal before it as required by section 2, of the act; (5) that the Governor illegally ordered issuance of the treasury notes before a binding contract had been made for the purchase of the bridge under sections 2, 6, and 23 of the act; (6) that the act is so uncertain as to be void because (a) it does not specify when an appraiser is to be appointed or when the appraisal is to be made; (b) whether the Governor may order sale of the notes before a binding contract is made; (c) no provisions are made as to who shall fix the maturity dates of the notes, what shall be done with notes already matured, when the first offer is ineffectual and the second sale required.

March 13, 1939, the Governor appointed S. L. Thorpe, O. O. Haga, A. E. Kliss and Wayne Hill members of the Toll Bridge Commission. Said members took the oath of office April 1, 1939, and filed the same with the Secretary of State April 12, 1939.

January 25, 1939, H. R. Flint, then Acting Commissioner of Public Works (formerly a party respondent, since succeeded by E. W. Sinclair appointed as commissioner) caused an independent written appraisal of the value of the bridge to be filed with the Department of Public Works and an amendment of said appraisal June 13, 1939, fixing the value of the bridge at $481,936.66.

At a meeting of the respondents, the Toll Bridge Committee, June 8, 1939, by resolution fixed the value of the bridge at

$482,000, and authorized its purchase at said price, and on the same day in accordance therewith, H. R. Flint contracted with the Twin Falls-Jerome Intercounty Bridge Company for the purchase of said bridge.

June 10, 1939, the Treasurer of the State of Idaho, on order from the Governor, published an offer of sale of treasury notes in the sum of $482,000 and fixed the maturities of said notes at six-month periods, in amounts from $31,000 to $38,000, from December 3, 1939, to July 1, 1946, and on June 23, 1939, sold said notes after advertising for sealed bids in accordance therewith to the Spokane and Eastern Trust Company of Spokane, Washington, the highest and best bidder.

No substantial departure from the requirements of the statute or injury is thus shown or suggested in the appointment of the bridge committee, their method of appraisal, the fact that Mr. Flint was not commissioner but merely acting as commissioner of public works, nor in the letting of the contract or issuance and sale of the treasury notes.

Mr. Flint and the committee appointed were at least *de facto* if not *de jure* officers (*State v. Enking,* 59 Ida. 321, 349, 82 Pac. (2d) 649), and the legislature had the authority to give the Governor power of appointment of the bridge committee without the consent of the Senate. (*Ingard v. Barker,* 27 Ida. 124, 147 Pac. 293.)

The procedure pursued herein was in substantial compliance with the statute and all constituted in practical sequence part of the entire transaction as contemplated by the statute and there was no delegation of legislative authority. (*State v. Taylor,* 58 Ida. 656, 78 Pac. (2d) 125; *Marshall v. Department of Agriculture,* 44 Ida. 440, 258 Pac. 171; *Chambers v. McCollum, supra; State v. Yelle,* 198 Wash. 110, 84 Pac. (2d) 688.)

The wisdom or necessity of the purchase is for the legislative and executive departments and not for us to consider or pass upon. (Art. 2, sec. 1, Const.; *J. C. Penney Co. v. Diefendorf, supra; Nez Perce R. Mills v. Public Utilities Com.,* 54 Ida. 696, 34 Pac. (2d) 972; *McGoldrick Lumber Co.*

*v. Benewah County,* 54 Ida. 704, 35 Pac. (2d) 659; *Boswell v. State, supra; State v. Yelle, supra.*)

The judgment of the trial court is therefore affirmed.

Costs to respondents.

Morgan and Holden, JJ., and Taylor and McDougal, D. JJ., concur.

Taylor and McDougal, D. JJ., sat in place of Ailshie, C. J., and Budge, J.