757 P.2d 664

Russell WESTERBERG, an individual; and Associated Taxpayers of Idaho, Inc., an Idaho corporation, Plaintiffs–Respondents,

v.

Cecil ANDRUS, as Governor of the State of Idaho; Idaho State Lottery Commission; and John Does 1–10, Defendants–Appellants.

HELP IDAHO THRIVE, an unincorporated association; and Idaho Allied Christian Forces, Inc., an Idaho corporation, Plaintiffs–Respondents,

v.

IDAHO STATE LOTTERY COMMISSION; Idaho Department of Revenue and Taxation; Cecil Andrus, in his capacity as Governor of the State of Idaho; John or Jane Doe # 1, John or Jane Doe # 2, John or Jane Doe # 3, John or Jane Doe # 4, and John or Jane Doe # 5, whose true names are not yet known, individually and in their capacities as members of the Idaho State Lottery Commission; John or Jane Doe # 6, whose true name is not yet known, individually and in his or her capacity as Director of the Idaho State Lottery Commission; and John Rooney, Defendants–Appellants.

No. 16910.

Supreme Court of Idaho.

June 7, 1988.

Hawley, Troxell, Ennis & Hawley, Boise, for defendants-appellants. John F. Kurtz, Jr., Sp. Deputy Atty. Gen., argued.

Moffatt, Thomas, Barrett & Blanton, Boise, for plaintiffs-respondents Westerberg and Associated Taxpayers of Idaho, Inc. Stephen R. Thomas argued.

Stanley D. Crow, Boise, for plaintiffs-respondents Help Idaho Thrive and Idaho Allied Christian Forces, Inc.

BAKES, Justice.

Plaintiffs brought two separate actions claiming that Title 63, ch. 26, Idaho Code (the "lottery initiative"), is unconstitutional. The two actions were consolidated in the district court by stipulation of the parties. The parties stipulated to certain facts and then filed cross motions for summary judgment. The district court ruled for plaintiffs, concluding that the lottery initiative violates Article III, § 20, of the Idaho

Constitution. Defendants appeal. We affirm.

The following is the factual record that was before the trial court. During February and March of 1986, the Idaho legislature considered resolutions which would have placed on the November, 1986, ballot an amendment to Article III, § 20, of the Idaho Constitution, to permit lotteries. Article III, § 20, provides:

"**Lotteries not to be authorized.**—The legislature shall not authorize any lottery or gift enterprise under any pretense or for any purpose whatever."

These resolutions failed to obtain the necessary two-thirds majority vote of both houses of the legislature which is required by Article XX, § 1, of the Idaho Constitution, in order for the proposed constitutional amendment to be placed on the general election ballot.[1]

Thereafter, in March of 1986, an initiative petition was filed with the Idaho Secretary of State, seeking to place the lottery initiative on the November, 1986, ballot. The petition was reviewed by the Attorney General's office, revised accordingly, and circulated in the state to obtain voter signatures.

After the necessary number of signatures was obtained, two of the plaintiffs in this case, Associated Taxpayers of Idaho, Inc., and Russell Westerberg, applied directly to the Idaho Supreme Court for a writ of prohibition to prevent the placement of the lottery initiative on the ballot. The writ of prohibition was denied, and the lottery initiative was placed on the November, 1986, general election ballot. *See Associated Taxpayers of Idaho, Inc. v. Cenarrusa*, 111 Idaho 502, 725 P.2d 526 (1986).

On November 4, 1986, 60% of the voters voted in favor of the lottery initiative. The governor declared the initiative "law" as of November 19, 1986. The lottery initiative was then codified as Title 63, ch. 26, of the Idaho Code.

Thereafter, on January 2 and 5, 1987, plaintiffs brought two separate actions claiming that the lottery initiative, Title 63, ch. 26, Idaho Code, was unconstitutional because it violated Article III, § 20, of the Idaho Constitution. Upon cross motions for summary judgment, the district court ruled for plaintiffs, concluding that the lottery initiative violates Article III, § 20, of the Idaho Constitution.

■ There is only one issue on appeal. Does Article III, § 20, of the Idaho Constitution, which prohibits the "legislature" from authorizing "any lottery or gift enterprise" prohibit the electorate from enacting a lottery through the initiative process? We hold that it does.

Article III, § 20, prohibiting lotteries was part of the Idaho Constitution when the Constitution was adopted in 1890. The initiative provision was not part of the Constitution at that time. Legislative power was vested exclusively in the Senate and House of Representatives. Article III, § 1, provided as follows:

"The legislative power of the State shall be vested in a Senate and House of Representatives. The enacting clause of every bill shall be as follows: 'Be it enacted by the Legislature of the State of Idaho.'"

In 1912, Article III, § 1, was amended which added the following initiative clause:

"The people reserve to themselves the power to propose laws, and enact the same at the polls independent of the legislature. This power is known as the

1. "[Idaho Const. art. 20] **§ 1. How amendments may be proposed.**—Any amendment or amendments to this Constitution may be proposed in either branch of the legislature, and if the same shall be agreed to by two-thirds (⅔) of all the members of each of the two (2) houses, voting separately, such proposed amendment or amendments shall, with the yeas and nays thereon, be entered on their journals, and it shall be the duty of the legislature to submit such amendment or amendments to the electors of the state at the next general election, and cause the same to be published without delay for at least three (3) times in every newspaper qualified to publish legal notices as provided by law. Said publication shall provide the arguments proposing and opposing said amendment or amendments as provided by law, and if a majority of the electors shall ratify the same, such amendment or amendments shall become part of this Constitution."

initiative, and legal voters may, under such conditions and in such manner as may be provided by acts of the legislature, initiate any desired legislation and cause the same to be submitted to the vote of the people at a general election for their approval or rejection provided that legislation thus submitted shall require the approval of a number of voters equal to a majority of the aggregate vote cast for the office of governor at such general election to be adopted."

Defendants argue that while Article III, § 20, precludes the legislature from authorizing a lottery, it does not foreclose the electorate from authorizing a lottery under Article III, § 1. They contend that Article III, § 20, of the Constitution, when read literally, precludes only the "legislature" from establishing a lottery, but not the electorate through their initiative power. Defendants maintain that had there been an intention to preclude the electorate from doing those things by initiative which are foreclosed to the legislature, the initiative amendment would have said as much; it would have specifically provided that those areas foreclosed to the legislature are also foreclosed to the electorate's initiative power. Apparently that was done in some states when they amended their constitutions to include an initiative power. *See generally* 42 Am.Jur.2d *Initiative and Referendum* § 6 (1969).

Defendants contend that the Idaho Constitution was drafted with care and precision in the use of the language, and with a full understanding of the accepted meaning of every word used, *citing Higer v. Hansen*, 67 Idaho 45, 170 P.2d 411 (1946). Defendants also maintain that the people are considered to be mindful of the state of law at the time they vote on a proposed constitutional amendment, *citing Idaho Mutual Benefit Ass'n, Inc. v. Robison*, 65 Idaho 793, 154 P.2d 156 (1944). Further, they rely upon the principle that a statute or constitutional provision, written in plain,

clear and unambiguous language, speaks for itself, and must be given the interpretation the wording clearly implies. In support they cite *State v. Jonasson*, 78 Idaho 205, 299 P.2d 755 (1956); *State ex rel. Haworth v. Berntsen*, 68 Idaho 539, 200 P.2d 1007 (1948); *Koon v. Bottolfsen*, 66 Idaho 771, 169 P.2d 345 (1946); and *Preston A. Blair Co. v. Jensen*, 49 Idaho 118, 286 P. 366 (1930).

Defendants' position is clear and straightforward. It involves a reading solely of Article III, § 20, as it is written, without reference to other constitutional provisions, thereby concluding that only the legislature is precluded from authorizing a lottery, not the electorate, through the initiative process, because Article III, § 20, contains no mention of the initiative process, but refers solely to the "legislature." However, our prior cases have held that statutory or constitutional provisions cannot be read in isolation, but must be interpreted in the context of the entire document.[2] *Wright v. Willer*, 111 Idaho 474, 476, 725 P.2d 179, 181 (1986) ("Statutes must be read to give effect to every word, clause and sentence."); *Hartley v. Miller–Stephan*, 107 Idaho 688, 690, 692 P.2d 332, 334 (1984), *reh'g denied* December 31, 1984 ("We will not construe a statute in a way which makes mere surplusage of the provisions included therein."); *Union Pacific RR. Co. v. Bd. of Tax Appeals*, 103 Idaho 808, 654 P.2d 901 (1982); *University of Utah Hospital & Medical Center v. Bethke*, 101 Idaho 245, 611 P.2d 1030 (1980), *reh'g denied* June 30, 1980; *Standlee v. State*, 96 Idaho 849, 852, 538 P.2d 778, 781 (1975) ("[I]n construing the Constitution, certain rules of interpretation must be kept in mind. Constitutional provisions apparently in conflict must be reconciled if at all possible."); *Idaho Telephone Co. v. Baird*, 91 Idaho 425, 429, 423 P.2d 337, 341 (1967) (Three sections of the Idaho Constitution, "inasmuch as they relate to the same matter or subject, *i.e.*, revenue and

---

**2.** The general rules of statutory construction apply to constitutional provisions generally, as well as to the amendment of a constitution. *Engelking v. Investment Board*, 93 Idaho 217, 458 P.2d 213 (1969), *reh'g denied* 1969; *Lewis v.* *Woodall*, 72 Idaho 16, 236 P.2d 91 (1951); *Keenan v. Price*, 68 Idaho 423, 195 P.2d 662 (1948); *Idaho Mut. Benefit Ass'n v. Robison*, 65 Idaho 793, 154 P.2d 156 (1944).

taxation, must be construed *in pari materia*."); *Lyons v. Bottolfsen*, 61 Idaho 281, 101 P.2d 1 (1940) (constitutional provisions prescribing maximum rate of taxation and prohibiting expenditures in excess of appropriations must be read with provision imposing a limitation on public indebtedness); *Bastian v. City of Twin Falls*, 104 Idaho 307, 310, 658 P.2d 978, 981 (Ct.App.1983), *petition for review denied* 1983 ("The particular words of a statute should be read in context; and the statute as a whole should be construed, if possible, to give meaning to all its parts in light of the legislative intent.").

Our sister states are in accord. *ITT World Communications, Inc. v. City and County of San Francisco*, 37 Cal.3d 859, 210 Cal.Rptr. 226, 693 P.2d 811, 816 (1985) ("A constitutional amendment ... should not be construed to effect the implied repeal of another constitutional provision."); *City and County of San Francisco v. Farrell*, 32 Cal.3d 47, 184 Cal.Rptr. 713, 648 P.2d 935, 938 (1982) (*en banc*) ("In construing the words of a statute or constitutional provision to discern its purpose, the provisions should be read together; an interpretation which would render terms surplusage should be avoided, and every word should be given some significance, leaving no part useless or devoid of meaning."); *In re Interrogatories of the United States District Court Pursuant to Rule 21.1*, 642 P.2d 496, 497 (Colo.1982) (*en banc*) ("[W]e are guided by a longstanding rule of constitutional construction that provisions contained in this state's constitution are to be interpreted as a whole with effect given to every term contained therein."); *In re Generic Investigation into Cable Television Services in the State of New Mexico*, 103 N.M. 345, 349, 707 P.2d 1155, 1159 (N.M. 1985) ("The provisions of the Constitution should not be considered in isolation, but rather should be considered as a whole.").

With those rules of construction in mind, we now review the interplay of Sections 1 and 20 of Article III. When Idaho's Constitution was adopted, legislative power was vested exclusively in the state legislature. Therefore, it appears that Article III, § 20's, purpose was to prohibit the authori-

zation of any lottery within Idaho. Just how clearly the drafters of the initiative amendment, or those who voted for its adoption, may have perceived the amendment's effect upon pre-existing constitutional restraints, is problematic. There is no constitutional history answering the question, and the history of the times is of little help. However, our prior cases have dealt extensively with the issue.

In *Luker v. Curtis*, 64 Idaho 703, 136 P.2d 978 (1943), this Court stated:

"This power of legislation, reclaimed by the people through the medium of the amendment to the constitution, did not give any more force or effect to initiative legislation than to legislative acts but placed them on an equal footing. The power to thus legislate is derived from the same source...." 64 Idaho at 706, 136 P.2d at 979.

Continuing, we further stated:

"The people adopted a constitution which divides the powers of state government into three distinct branches (Const. art. II, sec. 1), the first and foremost of which is the legislative power (Const., art. III, sec. 1) 'vested in a senate and house of representatives.' Then, as an afterthought and by way of amendment (in 1912), they reclaimed certain specified powers, one of which was 'the power to propose laws, and enact the same at the polls independent of the legislature.' This created an alternative method for passage of a law and, *by the very terms of the reservation, the alternative method can only be exercised 'under such conditions and in such manner as may be provided by acts of the legislature.'* The initiative and referendum provision of the amendment to the constitution lay dormant for more than twenty years until the legislature by chap. 210 of the 1933 session enacted the provisions of that chapter, prescribing the manner and method of exercising the initiative and referendum privileges." 64 Idaho at 707–708, 136 P.2d at 980 (citations omitted, emphasis added).

Later, in *State v. Finch*, 79 Idaho 275, 315 P.2d 529 (1957), this Court expressly ad-

dressed the question of constitutional limitations upon initiative legislation:

"Initiative legislation is of the same force and effect as that enacted by both houses of the legislature and approved by the governor, *and must not violate any constitutional provision of the United States or of the State of Idaho.*" 79 Idaho at 280, 315 P.2d at 530 (emphasis added).

*Accord Legislature of the State of California v. Deukmejian,* 34 Cal.3d 658, 194 Cal.Rptr. 781, 669 P.2d 17, 18 (1983) (*en banc*) (initiative kept off ballot based upon principle that "in the enactment of statutes[,] the constitutional limitations that bind the legislature apply with equal force to the people's reserved power of initiative").

Our prior cases make it clear that the initiative process is just one of three ways that the "legislative power of the state" is to be exercised under Article III, § 1, of the Idaho Constitution, as amended in 1912 (the legislature and the referendum are the other two). Initiative legislation is on an equal footing with legislation enacted by the state and must comply with the same constitutional requirements ·as legislation enacted by the Idaho legislature. *Luker v. Curtis, supra; State v. Finch, supra.* Accordingly, we conclude that Article III, § 20, prohibits the establishment of a lottery through any legislative process, including the initiative.

Were the Court today to accept the defendants' argument that initiative legislation is not subject to the same constitutional limitations as legislation enacted by the Idaho legislature, we would have to attribute to those who amended the Constitution in 1912 an intent to make a major change in the public policy of this state, not only with regard to the legality of lotteries, but also as to numerous other legislative prohibitions contained in various sections of the Idaho Constitution. For example, Article III, § 19, contains an extended list of legislative prohibitions involving local or special laws which, if the defendants' interpretation were accepted, could be swept away by initiative legislation.[3] There is

3. "[Art. 3] § 19. Local and special laws prohibited.—The legislature shall not pass local or special laws in any of the following enumerated cases, that is to say:

"Regulating the jurisdiction and duties of justices of the peace and constables.

"For the punishment of crimes and misdemeanors.

"Regulating the practice of the courts of justice.

"Providing for a change of venue in civil or criminal actions.

"Granting divorces.

"Changing the names of persons or places.

"Authorizing the laying out, opening, altering, maintaining, working on, or vacating roads, highways, streets, alleys, town plats, parks, cemeteries, or any public grounds not owned by the state.

"Summoning and impaneling grand and trial juries, and providing for their compensation.

"Regulating county and township business, or the election of county and township officers.

"For the assessment and collection of taxes.

"Providing for and conducting elections, or designating the place of voting.

"Affecting estates of deceased persons, minors, or other persons under legal disabilities.

"Extending the time for collection of taxes.

"Giving effect to invalid deeds, leases or other instruments.

"Refunding money paid into the state treasury.

"Releasing or extinguishing, in whole or in part, the indebtedness, liability or obligation of any person or corporation in this state, or any municipal corporation therein.

"Declaring any person of age, or authorizing any minor to sell, lease or incumber his or her property.

"Legalizing as against the state the unauthorized or invalild act of any officer.

"Exempting property from taxation.

"Changing county seats, unless the law authorizing the change shall require the two-thirds (2/3) of the legal votes cast at a general or special election shall designate the place to which the county seat shall be changed; provided, that the power to pass a special law shall cease as long as the legislature shall provide for such change by general law; provided further, that no special law shall be passed for any one county oftener than once in six (6) years.

"Restoring to citizenship persons convicted of infamous crimes.

"Regulating the interest on money.

"Authorizing the creation, extension or impairing of liens.

"Chartering or licensing ferries, bridges or roads.

"Remitting fines, penalties or forfeitures.

"Providing for the management of common schools.

"Creating offices or prescribing the powers and duties of officers in counties, cities, townships, election districts, or school districts, except as in this constitution otherwise provided.

"Changing the law of descent or succession.

nothing in the proceedings or the history surrounding the amendment of Article III, § 1, in 1912 which suggests an intent to affect the legislative prohibitions contained in these other sections of the Constitution.

Furthermore, the amendment to Article III, § 1, did not itself permit initiative legislation, but only permitted the legislature to authorize the promulgation of initiative legislation "under such conditions and in such manner and as may be provided by acts of the legislature." The legislature did not act to grant the electorate the right to initiate legislation until the year 1932 when, for the first time, it enacted laws establishing the initiative procedure. It would be somewhat incongruous to conclude that after the amendment to Article III, § 1, the legislature could empower the electorate to initiate lottery legislation, when the legislature itself could not initiate such legislation. The acts of the legislature and initiative legislation stand on "equal footing," *Luker v. Curtis, supra,* and such "initiative legislation is of the same force and effect as that enacted by both houses of the legislature and approved by the governor, and *must not violate any constitutional provision ... of the state of Idaho." State v. Finch, supra* 79 Idaho at 280, 315 P.2d at 534.

This Court has previously recognized the strong "public policy of the State relative to the licensing or operation of lotteries ... fixed by the framers of the Constitution," *State v. Village of Garden City,* 74 Idaho 513, 525, 265 P.2d 328, 333 (1953). In that case this Court dealt with the issue of gambling in Garden City. The state legislature and Garden City had attempted to legalize slot machines, punch boards, chance spindles, and chance prize games. This Court determined that the various devices were lotteries, and that calling them something different did not change their character. Although not dealing with an initiative, but rather with state statutes and a municipal ordinance, this Court spoke

in very broad terms concerning the prohibitions against lotteries:

"It therefore follows that slot machines, mechanical amusement devices, punchboards, chance spindles, chance prize games, as defined in the acts attempting to legalize them, and all other similar contrivances, devices and schemes are lotteries, *and any legislative act authorizing, or attempting to authorize their operation in any manner, is unconstitutional, being prohibited by Art. 3, § 20, of the Idaho Constitution."* 74 Idaho at 523, 265 P.2d at 332 (emphasis added).

It was thus concluded that the acts of the legislature were unconstitutional and void. This Court then extended its rule beyond the state legislature to the Garden City ordinance, stating:

"An unconstitutional act is not a law. Hence the statutes here attacked, being unconstitutional, the appellants cannot successfully contend that the nuisance complained of was carried on under authority of the State, or that such devices were operated under authority of the provisions of an ordinance of Garden City. [Citations omitted.]

*"All the people of the State are bound by constitutional limitations* and Art. 3, § 20 of the Constitution is, with the other provisions, the supreme law of the land. [Citations omitted.] *Hence there is no valid statute or ordinance* authorizing the businesses in which the appellants were engaged, and here complained of." 74 Idaho at 524, 265 P.2d at 333 (emphasis added).

The thrust of *Village of Garden City* is that, under Article III, § 20, lotteries are unconstitutional and prohibited, not merely that the legislature cannot authorize them. This reading of *Village of Garden City* is in conformance with the Supreme Court of Colorado's approach in *In re Interrogatories of Governor,* 196 Colo. 353, 585 P.2d 595 (1978). There the public exercised its referendum power in the affirmative on a

"Authorizing the adoption or legitimization of children.

"For limitation of civil or criminal actions.

"Creating any corporation.

"Creating, increasing or decreasing fees, percentages, or allowances of public officers during the term for which said officers are elected or appointed."

proposal to authorize sweepstakes races. The Colorado Supreme Court held that the games at issue were lotteries and thus prohibited. The Court then continued:

"Article XVIII, Section 2, by its terms prohibits the General Assembly from authorizing lotteries. We think it clear that the framers of the Colorado Constitution intended that the legislative power of the state not be used to authorize lotteries, whether or not that exercise of legislative power is ratified directly by the people through a referendum. [Citations omitted.]

"Colorado history reflects that Article V, Section 1 [the referendum section of the Colorado Constitution] was not made a part of the Colorado Constitution until 1910. The framers of our constitution prohibited lotteries in the broadest terms at the time Article XVIII, Section 2 was enacted. In so doing, they 'were seeking to suppress and restrain the spirit of gambling which is cultivated and stimulated by schemes whereby one is induced to hazard his earnings with the hope of large winnings.' [Citations omitted.] When the framers adopted Article XVIII, Section 2, they extended its prohibitions to all existing legislative power. The constitutional draftsmen plainly intended that the power to conduct lotteries could be restored by constitutional amendment, but not by referendum.

"The people, in the exercise of their referendum powers, are bound by the same rules in this respect as the General Assembly. [Citations omitted.] As such, the power of referendum is limited by Article XVIII, Section 2." 585 P.2d at 598.

The principle that constitutional limitations upon the legislature are applicable to legislation enacted by initiative is widely recognized in legal literature.

"Constitutional provisions for initiative and referendum do not violate the guarantee in the federal constitution of a republican form of government. *The power to legislate by initiative or referendum is, however, subject to the same substantive constitutional limitations as those applicable to the legislature*

*itself.*" 1 Singer, Sutherland Statutory Construction § 4.09 (4th ed. 1985) (emphasis added).

"In construing a law for both definitional and constitutional purposes, courts see no essential difference between measures enacted by initiative and referendum and those created through the usual legislative process. Neither is superior to the other, and are treated as equal in regard to their force, effect, and limitations. Thus, *laws created by initiative or approved by referendum ... must yield to the superior authority of the state or federal constitution ... in any case of conflict.*" 2 Singer, Sutherland Statutory Construction § 36.05 (4th ed. 1986) (emphasis added).

*See also* 42 Am.Jur.2d *Initiative and Referendum* § 6 (1969); 82 C.J.S. *Statutes* § 118 (1953); Annot., *Applicability of Constitutional Requirements as to Legislation or Constitutional Amendments, to Statutes or Constitutional Amendments Under Provision Conferring Initiative or Referendum Powers*, 62 A.L.R. 1349 (1929).

The weight of authority demonstrates that the constitutional prohibition against lotteries in Article III, § 20, of the Idaho Constitution, extends to all legislative power, whether exercised by the legislature or by the electorate. Certainly, this Court has previously recognized that legislative acts and legislation by initiative are on equal footing and are subject to the same limitations.

Accordingly, the district court was correct in declaring Title 63, chapter 26, Idaho Code, unconstitutional. Its decision and judgment are therefore affirmed. Costs to respondents. No attorney fees on appeal.

SHEPARD, C.J., and HUNTLEY and JOHNSON, JJ., concur.

BISTLINE, Justice, dissenting.

Borrowing language from Julius Caesar, "the die was cast" in this case in September of 1986, when this Court issued its decision and opinions in *Associated Taxpayers v. Cenarrusa*, 111 Idaho 502, 725

P.2d 526 (1986). The interested reader will remember that there Justice Bakes joined Justice Huntley in the holding that "The lottery initiative violates art. 3, § 20, of the Idaho Constitution. It is clearly an unconstitutional act, and an unconstitutional act is not a law." 111 Idaho at 511, 725 P.2d at 537. Judge Schroeder in his opinion in this case took cognizance of the situation which he faced:

> Forecasting the future is generally a gamble. However, in the context of this case there appears to be a better chance of predicting the fate of this initiative in the Supreme Court than there is of drawing the winning number in a lottery.

\* \* \* \* \* \*

Two of the five justices of the Supreme Court presently sitting have determined that the initiative is unconstitutional.

\* \* \* \* \* \*

Beyond simply counting numbers and anticipating that one of the three remaining justices will agree with Justices Huntley and Bakes, it appears likely that the Supreme Court will follow the general rule that legislation by initiative is on an equal footing with legislation by the state legislature, and Article III, § 20 prohibits the establishment of a lottery through any legislative process, including the initiative.

As I have pointed out on prior occasions, backed by the teachings of experience, in this business of appellate judging, three votes beats two any day. Exhibiting some degree of intuitiveness I wrote at that time to suggest the improvidence of Justices Bakes and Huntley "in forecasting the invalidity of the proposed lottery initiative." 111 Idaho at 506, 725 P.2d at 30. Noting that life is not all that certain, my opinion observed that:

> While chances are that, should the initiative pass into law, there will be a challenge, chances also are that the five attorneys who presently serve as justices of the Idaho Supreme Court might not

yet be sitting when any challenge reaches this Court.

111 Idaho at 506, 725 P.2d at 530.

Had I been equally improvident at that time my vote would probably have brought me to joining ranks with Justices Bakes and Huntley. However, it would have been clearly wrong for me to vote on a constitutional issue which was not properly before us.[1] Such was well pointed out in the separate opinions authored by Chief Justice Donaldson, Justice Shepard, and myself.

The problem with addressing an issue not properly before the Court is that counsel for the respective parties may not have anticipated such an impropriety on the part of the Court; hence the briefing may not be sufficiently thorough. For certain, the briefs and oral argument which are before us now are not mere replays of the briefs which we had in the *Taxpayers v. Cenarrusa* case.

At the time of *Taxpayers* our focus was, as clearly demonstrated by the views of Justices Bakes and Huntley, brought to bear almost entirely on the constitutional *invalidity* of any lottery measure. The language of the Constitution was passively accepted as explicit in declaring that lotteries are per se unconstitutional in Idaho. So I thought two years ago when the *Taxpayers* case was argued.

However, when the instant case was laid before us, complete with briefs and oral argument, a whole new aspect of the case materialized as to the tenor of the applicable constitutional provision:

> **§ 20. Lotteries not to be authorized.—** The legislature shall not authorize any lottery or gift enterprise under any pretense or for any purpose whatever.

Idaho Const. art 3, § 20. This provision can only be read as applicable to, and only to, the Legislative Department. Broader in scope is art. 1, DECLARATION OF RIGHTS. Section 2 thereof contains extremely powerful language:

> **§ 2. Political power inherent in the people.—**All political power is inherent in

---

1. Had I joined the justices who declared the initiative unconstitutional before the issue was properly before us, such public prejudging would have required that I recuse myself from sitting on the instant case. So I read the Judicial Canons adopted by this Court.

the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform or abolish the same whenever they may deem it necessary; and no special privileges or immunities shall ever be granted that may not be altered, revoked, or repealed by the legislature.

Idaho Const. art 1, § 2. That statement as to where political power is vested, "in the people," should not be taken as just so much flowery language. Two hundred and twelve years ago the "Representatives of the United States of America, in General Congress assembled," did *"in the name and by authority of the good people* of these colonies," dissolve all political ties with Great Britain. Additionally, as all of us have recently been made aware, two hundred years ago the Preamble to the Constitution of the United States stated: "We *the people* of the United States ... *do ordain and establish this Constitution ..."*

Today those two members of this Court who 18 months ago did not hesitate to unequivocally declare the unconstitutionality of any people's legislation authorizing or creating a lottery enterprise in Idaho have made that forecast stand up. This is not unexpected, but it is not necessarily a correct resolution of the issue or one in keeping with the powerful language of art. 1, § 2. Of a necessity that conclusion is achieved only by giving no recognition whatever to the constitutional *right of the people to legislate,* and that right is no more and no less an attribute of *all* political power having been vested in the people in the first instance. It was the *people's political power* which made the initial determination that they the people would create a legislature—which would serve for the purpose of attending to most legislation.

To the uninformed, the opinion authored by Justice Bakes will read impressively, but the decision could more easily have been written to uphold the exercise of political power inherent in the people especially in one of the few instances when the people have chosen to exercise it as they were encouraged to do by legislative leadership.

Simply put, "the people" when they choose to act where their representatives in the form of the legislature have not acted, are not a second legislature, but *are the people.*

Justice Bakes has correctly written that, "There is no constitutional history answering the question, and the history of the times is of little help." (p. 667) Inappropriately and by non sequitur, however, he later declares that "Initiative legislation is on an equal footing with legislation enacted by the state and must comply with the same constitutional requirements as legislation enacted by the Idaho legislature" (p. 668), for which he cites *Luker v. Curtis* and *State v. Finch.* The *Luker* opinion simply upheld the right in the legislature to repeal an initiative measure which had passed—finding nothing to prevent the legislature from so doing. Almost all of what was written in that case was *obiter dicta.* No one today would question the right of the 1988 legislature to have repealed the initiative. It did not do so, and that is not the issue presented to this Court at this time as was the situation in *Luker.* None of the case law cited in *Luker,* all from Wisconsin, South Dakota, Oregon, Oklahoma, Ohio, Missouri, Colorado, North Dakota, Kentucky, Washington, Arizona, or California has any bearing on the precise circumstances at hand, to wit, an Idaho constitution which is clear on its face and prohibits only the legislature, not the people, from enacting a lottery measure. The same can be said as to any of the authority cited by and relied upon in Justice Bakes' opinion.

In so observing, it is not intended to give an impression of being overly critical of the Justice Bakes' opinion. The problem encountered with it is simply that we *can* write on a clean slate, because he *is* correct in the one statement which I earlier herein so endorsed as accurate.

The people can legislature and they have done so. The plain and simple remedy for those who do not approve of this initiative legislation—if there need be a remedy—is for the legislature to repeal the people's

enactment. That would indeed cause the people to look to their legislators to propose a constitutional amendment for the people to ratify or reject.

The legislature has already attended to this, and today the Supreme Court simply joins the legislature in awaiting the outcome of the November ratification vote. Perhaps it is a course more attuned to an· exercise of discretion than to courage born of conviction. The legislature, however, had no "case" presented to it. To the contrary, this Court does.

Another interesting facet of this controversy not discussed by Justice Bakes is that the carefully worded language of art. 3, § 1 reads, "The people reserve to themselves the power to propose laws, and enact the same at the polls *independent of the legislature.*" (emphasis added). Thus, the Idaho Constitution unequivocally recognizes that the legislature and the people are distinct legislative entities, only *one* of which is endowed with *inherent* political power. Because the constitution prevents only the *legislature* from instituting a lottery, an initiative-sponsored lottery, as a result, cannot be said to offend art. 3, § 20.

Another missing facet is any discussion of the language in art. 1, § 20 which speaks to "lottery *enterprises,*" especially when considered with due regard to such being legislatively "authorized." This is of *paramount* consideration to a proper resolution of the issue presented.

The 1911 Idaho legislature took what it believed to be action appropriate to the constitutional ban prohibiting the legislature from authorizing lottery enterprises. The legislators of those early days recognized the propensity of Idaho citizenry to take a chance, and acted to penalize "every person" who made a business (enterprise) out of operating lotteries. Section 1 R.S. 1911 defined a lottery not in terms as we know it . today, i.e., cash monies, but a

"scheme for the disposal or distribution of property by chance ... whether called a lottery, raffle,[2] or gift enterprise, or by whatever name the same be known." I.C. § 18–4901. By R.S. 18–4902, –4903, –4904, –4905, –4906, and –4908, now I.C. §§ 18–4902 through –4908, all persons taking part in a lottery, including allowing the use of a vessel or building, were subject to prosecution for a misdemeanor,[3] and property and monies so used were contraband subject to confiscation.

There cannot be honest doubt in any mind that the 1911 legislators understood very clearly that the 1889 founding fathers sought to preclude private lottery enterprises from being authorized, enfranchised, or in any way or by any name sanctioned *by the legislature.*

Justice Bakes in drafting his opinion apparently saw of little value, and hence did not mention, the historical background provided to us in the exceptionally well-researched brief of Mr. John Kurtz in the opening brief of appellants. Unable to improve upon his presentation, I simply utilize it:

> However, this is a long history of lotteries in America. There were approximately 158 lotteries licensed before 1776, 132 of which benefited civic or other state purposes. Citizens such as John Hancock, Benjamin Franklin and George Washington managed lotteries for their communities thus making valuable contributions to their local economies. *See* Ezell, *Fortune's Merry Wheel, The Lottery in America* (Harvard University Press 1960), p. 272. After the outbreak of the revolution, the Continental Congress led the way by establishing a lottery to finance the revolutionary war. For the next few decades lotteries remained an accepted way of raising money. *Id.* at p. 272.

---

**2.** If given any notoriety this opinion may serve to save some good citizens from falling into the toils of the law by buying a chance on a quilt raffle.

**3.** Beginning in 1972, the laws were amended so as to provide under I.C. § ·18–4901 that the parimutuel system as used in racing shall not

constitute a lottery, so long as it conforms with ch. 25, Title 54, Idaho Code. The first amendment put the legislative stamp of approval on betting on the horses; the second amendment in 1987 brought dog races into the ambit of *not* being a "by chance" disposal of cash receipts.

In the early nineteenth century, various groups began questioning the use of lotteries. In response, many states passed constitutional provisions or legislation revoking lottery charters and monopolies that had previously been granted by the states. *Id.* at pp. 272–74. In a relatively short time only the gigantic Louisiana State Lottery dominated the scene. The Louisiana Lottery existed from 1864 through 1892. *Id.* at p. 274.

In 1889, when the Idaho State Constitutional Convention met, the Louisiana Lottery was in its final years. *Id.* pp. 242–45. There were repeated claims that the Louisiana Lottery Company, which had been given a monopoly charter to operate the lottery in the State of Louisiana, controlled every Louisiana legislature from 1868 to 1892. *Id.* at p. 245. Thus, it was with a recent background of charges of widespread corruption and bribes of the Louisiana legislature relating to the operation of the Louisiana lottery that the Idaho Constitutional Convention met in 1889.

Appellant's Brief, p. 9. As I have taken pains to illustrate, the very language of art. 3. § 20 strongly suggests that the founding fathers had in mind only that the legislature should be precluded from authorizing the operation of lotteries by private enterprise. Students of history will remember that none of the founding fathers were native-born Idahoans, but rather a conglomeration of people who chose to leave their old homes in the midwestern, eastern, and southern states and selected the Territory of Idaho as their new homes and places of business or occupation. In those days there was no television, no radio, no telephones, and lots of time to visit —which would naturally be in large part centered around news from home via letters and newspapers.

I doubt very much that any one on the Court will seriously challenge Mr. Kurtz' assertion that the members of the 1889 constitutional convention were well aware of the situation in Louisiana where the legislature had authorized private enterprise to operate a lottery and such private enterprise became a corrupt influence.

Without question there could be found few aspiring entrepreneurs in Idaho who would not welcome the opportunity to so profitably engage themselves.

At the time Idaho embarked upon statehood there was no more thought about the state itself operating its own lottery than there was about the state going into the business of selling liquor by the drink. In time both have come to pass, and if there is anything in the constitution which prohibits *the State* from doing either, I would be pleased to have it brought to my attention.

It cannot seriously be said that the 1911 criminal statutes—specifically made applicable to "person" or persons, were meant to have any application other than to persons in unauthorized private enterprise. Enterprise is not now and was not in 1889 an unusual word. An enterpriser (perhaps a seldom used word) is better known by the appellation of entrepreneur. One dictionary definition of enterprise is business organization. Others include: a unit of economic organization; any systematic or purposeful activity. Webster's Third New International Dictionary 757 (1967). The United States Congress has defined enterprise thusly:

> "Enterprise" means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units.

29 U.S.C. § 203(r). The Supreme Court of the United States has also been heard:

> The District Court correctly identified the three main elements of the statutory definition of 'enterprise': related activities, unified operation or common control, and common business purpose.

*Brennan v. Arnheim & Neely Inc.,* 410 U.S. 512, 93 S.Ct. 1138, 35 L.Ed.2d 463 (1973).

As a mere citizen, or were I a legislator or a governor, I would be the first to cry out against any legislation, be it by the people, or by the legislature, which pur-

ported to authorize any private business venture or company to set up and operate a lottery in Idaho. As a jurist, I would oppose such as amounting to the very violation proscribed by our Idaho Constitution. If the 1989 Idaho legislature should decide to commemorate the one-hundredth anniversary of Idaho's statehood and its Constitution by repealing the initiative lottery legislation, that will be no concern of mine.

The view which as I see it is entertained by Justice Bakes and the justices who join his opinion is that the people cannot do what the legislature cannot do. That notion has been addressed and sufficiently dispelled, but nonetheless four votes beats one even more soundly than three beats two.

Justice Bakes is also seemingly of the view that even the state legislature cannot create a state-owned and state-operated lottery. What I have written should serve to dispel that notion as well. It is not seen where Justice Bakes has attempted to comprehend what the founding fathers were stating by their very careful and select choice of words in light of those particular times and the experience of state legislatures which had authorized private lotteries.